UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

FUJIFILM CORPORATION,

          Plaintiff,

    v.

MOTOROLA MOBILITY LLC,

          Defendant.

Case No.  12-cv-03587-WHO

**ORDER REGARDING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND PLAINTIFF'S MOTION TO STRIKE**

Re: Dkt. Nos. 153, 155, 159, 160, 166

## INTRODUCTION

This is a patent infringement action.  Defendant Motorola Mobility LLC ("Motorola") moves for summary judgment of noninfringement on each of the claims asserted against it.  Plaintiff Fujifilm Corporation ("Fujifilm") moves to strike portions of two expert reports submitted by Motorola regarding invalidity.  For the reasons discussed below, both motions are GRANTED IN PART and DENIED IN PART.

## BACKGROUND

Fujifilm alleges that Motorola infringes claim 1 of U.S. Patent No. 5,734,427 (the '427 patent); claims 1, 2, 7, and 11 of U.S. Patent No. 6,144,763 (the '763 patent); claim 1 of U.S. Patent No. 8,306,285 (the '285 patent); claim 11 of U.S. Patent No. 7,327,886 (the '886 patent); and claims 1, 13, and 35 of U.S. Patent No. 6,915,119 (the '119 patent).  Each of the asserted patents concerns technology used in digital cameras and cellular telephones.  The asserted claims and underlying technology are discussed in more detail where relevant in the "Discussion" section below.

Fujifilm filed its initial complaint on July 10, 2012 and a first amended complaint on November 19, 2012.  Dkt. Nos. 1, 16.  Motorola served its initial invalidity contentions on April 19, 2013 and its supplemental invalidity contentions on February 7, 2014.  Snodgrass Decl. Ex. 1

(Dkt. No. 160-2); Dkt. No. 96.  The supplemental invalidity contentions assert that the '119 patent is invalid, among other reasons, because the claimed subject matter was invented by "Nokia, including engineers at Nokia," during a period of collaboration between Fujifilm and Nokia in 1999 and 2000.  Dkt. No. 96 at 5.

On June 16, 2014, I granted Motorola leave to amend its answer and counterclaim to assert claims and defenses arising from Fujifilm's alleged derivation and inequitable conduct.  Dkt. No. 127.  During a case management conference on December 17, 2013, I granted Motorola's request to limit the number of claims that Fujifilm could assert and the number of prior art references on which Motorola could rely.  Dkt. Nos. 71, 72.  I limited Fujifilm to a total of sixteen claims and no more than five per patent.  Dkt. No. 72.  I limited Motorola to a total of twenty prior art references and no more than six per patent.  *Id.*

Fujifilm served its Reduced Set of Asserted Patent Claims on January 31, 2014; Motorola served its Reduction of Prior Art References on February 14, 2014.  Snodgrass Decl. Exs. 4-5 (Dkt. Nos. 160-5, 160-6).  By email dated September 26, 2014, Fujifilm further reduced its asserted claims to the ten it now asserts.  Snodgrass Decl. Ex. 6 (Dkt. No. 160-7).

Motorola filed its motion for summary judgment on December 9, 2014.  Dkt. No. 153.  Fujifilm filed its motion to strike on December 17, 2014.  Dkt. No. 160.  I heard argument from the parties on January 21 and 22, 2015.  Dkt. Nos. 183-84.

## LEGAL STANDARDS

### I.    SUMMARY JUDGMENT

A party is entitled to summary judgment where it "shows that there is no genuine dispute as to any material fact and [it] is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A dispute is genuine if it could reasonably be resolved in favor of the nonmoving party.  *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986).  A fact is material where it could affect the outcome of the case.  *Id.*

The moving party has the initial burden of informing the court of the basis for its motion and identifying those portions of the record that demonstrate the absence of a genuine dispute of material fact.  *See Celotex Corp. v. Catrett,* 477 U.S. 317, 323-24 (1986).  Once the movant has

made this showing, the burden shifts to the nonmoving party to identify specific evidence showing that a material factual issue remains for trial. *Id.* The nonmoving party may not rest on mere allegations or denials from its pleadings, but must "cit[e] to particular parts of materials in the record" demonstrating the presence of a material factual dispute. Fed. R. Civ. P. 56(c)(1)(A); *see also, Liberty Lobby,* 477 U.S. at 248. The nonmoving party need not show that the issue will be conclusively resolved in its favor. *Id.* at 248-49. All that is required is the identification of sufficient evidence to create a genuine dispute of material fact, thereby "requir[ing] a jury or judge to resolve the parties' differing versions of the truth at trial." *Id.* (internal quotation marks omitted). If the nonmoving party cannot produce such evidence, the movant "is entitled to . . . judgment as a matter of law because the nonmoving party has failed to make a sufficient showing on an essential element of her case." *Celotex,* 477 U.S. at 323.

On summary judgment, the court draws all reasonable factual inferences in favor of the nonmoving party. *Liberty Lobby,* 477 U.S. at 255. "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Id.* However, conclusory and speculative testimony does not raise a genuine factual dispute and is insufficient to defeat summary judgment. *See Thornhill Publ'g Co., Inc. v. GTE Corp.,* 594 F.2d 730, 738-39 (9th Cir. 1979).

## II.    SUMMARY JUDGMENT OF NONINFRINGEMENT

Summary judgment of noninfringement requires a two-step analysis. "First, the claims of the patent must be construed to determine their scope. Second, a determination must be made as to whether the properly construed claims read on the accused device." *Pitney Bowes, Inc. v. Hewlett-Packard Co.,* 182 F.3d 1298, 1304 (Fed. Cir. 1999) (internal citations omitted). "The determination of infringement, both literal and under the doctrine of equivalents, is a question of fact." *Lockheed Martin Corp. v. Space Sys./Loral, Inc.*, 324 F.3d 1308, 1318 (Fed. Cir. 2003); *see also, Kilopass Tech. Inc. v. Sidense Corp.*, No. 10-cv-02066-SI, 2012 WL 3545286, at *4 (N.D. Cal. Aug. 16, 2012). Because the ultimate burden of proving infringement rests with the patentee, an accused infringer may show that summary judgment of noninfringement is proper either by producing evidence that would preclude a finding of infringement, or by showing that the evidence

3

United States District Court
Northern District of California

1    on file fails to create a material factual dispute as to any essential element of the patentee's case.

2    *See Novartis Corp. v. Ben Venue Labs., Inc.*, 271 F.3d 1043, 1046 (Fed. Cir. 2001).  "Summary

3    judgment of noninfringement may only be granted if, after viewing the alleged facts in the light

4    most favorable to the nonmovant and drawing all justifiable inferences in the nonmovant's favor,

5    there is no genuine issue whether the accused device is encompassed by the patent claims."  *Id.*

6         Direct infringement may be proven either by literal infringement or under the doctrine of

7    equivalents.  "Literal infringement requires the patentee to prove that the accused device contains

8    each limitation of the asserted clai[m]."  *Bayer AG v. Elan Pharm. Research Corp.*, 212 F.3d 1241,

9    1247 (Fed. Cir. 2000).  "If any claim limitation is absent from the accused device, there is no literal

10   infringement as a matter of law."  *Id.*  "The doctrine of equivalents holds that even if an accused

11   product does not literally infringe the asserted claims of a patent, the product may infringe if the

12   differences between the element of the accused product at issue and the claim limitation at issue are

13   insubstantial."  *Kilopass*, 2012 WL 3545286, at *7.  To defeat a defendant's motion for summary

14   judgment of noninfringement under the doctrine of equivalents, the plaintiff must provide

15   "particularized testimony and linking argument on a limitation-by-limitation basis that create[s] a

16   genuine issue of material fact as to equivalents."  *AquaTex Indus., Inc. v. Techniche Solutions*, 479

17   F.3d 1320, 1328-29 (Fed. Cir. 2007).  "Whether equivalency exists may be determined based on

18   the 'insubstantial differences' test or based on the 'triple identity' test, namely, whether the element

19   of the accused device performs substantially the same function in substantially the same way to

20   obtain the same result."  *TIP Sys., LLC v. Phillips & Brooks/Gladwin, Inc.*, 529 F.3d 1364, 1376

21   (Fed. Cir. 2008).  "Whether a claim is infringed under the doctrine of equivalents may be decided

22   on summary judgment if no reasonable jury could determine that the limitation and the element at

23   issue are equivalent."  *Zelinski v. Brunswick Corp.,* 185 F.3d 1311, 1317 (Fed. Cir. 1999).

24   **III.    MOTION TO STRIKE**

25        **A.    Patent Local Rules**

26        "Patent Local Rule 3 requires patent disclosures early in a case and streamlines discovery

27   by replacing the series of interrogatories that parties would likely have propounded without it."

28   *ASUS Computer Int'l v. Round Rock Research, LLC*, No. 12-CV-02099-JST, 2014 WL 1463609, at

*1 (N.D. Cal. Apr. 11, 2014) (internal quotation marks and modifications omitted).  The disclosure requirements of Rule 3 are designed "to require parties to crystallize their theories of the case early in the litigation and to adhere to those theories once they have been disclosed."  *Nova Measuring Instruments Ltd. v. Nanometrics, Inc.*, 417 F. Supp. 2d 1121, 1123 (N.D. Cal. 2006).  "They are also designed to provide structure to discovery and to enable the parties to move efficiently toward claim construction and the eventual resolution of their dispute."  *Golden Bridge Tech. Inc v. Apple, Inc.*, No. 12-cv-04882-PSG, 2014 WL 1928977, at *3 (N.D. Cal. May 14, 2014) (internal quotation marks omitted); *see also, O2 Micro Int'l Ltd. v. Monolithic Power Sys., Inc.*, 467 F.3d 1355, 1365-66 (Fed. Cir. 2006) ("The local patent rules in the Northern District of California [require] both the plaintiff and the defendant in patent cases to provide early notice of their infringement and invalidity contentions, and to proceed with diligence in amending those contentions when new information comes to light in the course of discovery.  The rules thus seek to balance the right to develop new information in discovery with the need for certainty as to the legal theories.").

Patent Local Rule 3-1 requires that a party claiming patent infringement serve a "Disclosure of Asserted Claims and Infringement Contentions" no more than fourteen days after the initial case management conference.  This disclosure must include "[e]ach claim of each patent in suit that is allegedly infringed by each opposing party, including for each claim the applicable statutory subsections of 35 U.S.C. § 271 asserted."  Patent L.R. 3-1(a).  The party must also identify "where each limitation of each asserted claim is found within each Accused Instrumentality," and "[w]hether each limitation of each asserted claim is alleged to be literally present or present under the doctrine of equivalents."  Patent L.R. 3-1(e).

Patent Local Rule 3-3 requires parties accused of infringement to serve invalidity contentions.  The invalidity contentions must identify "each item of prior art that allegedly anticipates each asserted claim or renders it obvious."  Patent L.R. 3-3(a).  If obviousness is alleged, the invalidity contentions must contain "an explanation of why the prior art renders the asserted claim obvious, including an identification of any combinations of prior art showing obviousness."  Patent L.R. 3-3(b).

"Given the purpose behind [these] disclosure requirements, a party may not use an expert report to introduce new infringement theories, new infringing instrumentalities, new invalidity theories, or new prior art references not disclosed in the parties' infringement contentions or invalidity contentions." *Verinata Health, Inc. v. Sequenom, Inc.*, No. 12-cv-00865-SI, 2014 WL 4100638, at *3 (N.D. Cal. Aug. 20, 2014) (internal quotation marks omitted); *see also, Golden Bridge Tech. Inc v. Apple, Inc.*, No. 12-cv-04882-PSG, 2014 WL 1928977, at *3 (N.D. Cal. May 14, 2014) ("Expert reports may not introduce theories not set forth in contentions."). "Any invalidity theories not disclosed pursuant to Local Rule 3-3 are barred . . . from presentation at trial (whether through expert opinion testimony or otherwise)." *MediaTek Inc. v. Freescale Semiconductor, Inc.*, No. 11-cv-05341-YGR, 2014 WL 690161, at *1 (N.D. Cal. Feb. 21, 2014).  In determining whether to strike some or all of an expert report for failure to comply with the patent local rules, courts in this district have asked, "[W]ill striking the report result in not just a trial, but an overall litigation, that is more fair, or less?" *Apple Inc. v. Samsung Electronics Co.*, No. 11-cv-01846-PSG, 2012 WL 2499929, at *1 (N.D. Cal. June 27, 2012); *Verinata Health*, 2014 WL 4100638, at *3.

### B.   Federal Rule of Evidence 702

Rule 702 allows a qualified expert to testify "in the form of an opinion or otherwise" where:

(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

(b) the testimony is based on sufficient facts or data;

(c) the testimony is the product of reliable principles and methods; and

(d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.

Expert testimony is admissible under Rule 702 "if it is both relevant and reliable." *Cooper v. Brown*, 510 F.3d 870, 942 (9th Cir. 2007).  "[R]elevance means that the evidence will assist the trier of fact to understand or determine a fact in issue." *Id.*  Under the reliability requirement, expert testimony must "relate to scientific, technical, or other specialized knowledge, which does

6

not include unsubstantiated speculation and subjective beliefs." *Id.* "Importantly, there must be a recognized body of knowledge, learning, or expertise upon which the witness relies. Where there is no field of expertise, nobody will qualify as an expert witness on the subject." *Perez v. Seafood Peddler of San Rafael, Inc.*, No. 12-cv-00116-WHO, 2014 WL 2810144, at *2 (N.D. Cal. June 20, 2014) (internal quotation marks omitted). The burden is on the proponent of the expert testimony to show, by a preponderance of the evidence, that the admissibility requirements are satisfied. Fed. R. Evid. 702 advisory committee's note.

## DISCUSSION

I.     **MOTOROLA'S MOTION FOR SUMMARY JUDGMENT**

A.     **Initial Matters**

1.     **Claim Construction Arguments**

The bulk of Motorola's noninfringement arguments rest on claim construction positions that were not raised during the claim construction process in this case. For example, Motorola advocates constructions of the terms "pixels of the same color" and "corresponding to a spatial distance between adjacent pixels" in the '427 patent that would preclude a finding of literal infringement even under Fujifilm's characterization of the accused products.[1] Mot. 1, 8-13. Motorola contends that such claim construction arguments must be resolved at summary judgment. Mot. 4. Fujifilm responds that Motorola has submitted a "second claim construction brief" and contends that "the real dispute between the parties [is] the application of the plain meaning of the claims to the accused products." Opp. 1-2. Fujifilm argues that because the parties' experts offer competing opinions regarding the claims' plain meaning, material factual disputes remain for trial, and Motorola's summary judgment motion "should be denied in full on that basis alone." *Id.*

The parties' positions on how to approach Motorola's claim construction arguments are not that far apart. The parties agree on the characterization of the accused products. They agree for the most part that if Motorola prevails on its claim construction arguments, the accused products do not literally infringe as a matter of law. They also agree that because the disputed terms were not

_____

[1] For the purposes of this motion, Motorola accepts Fujifilm's characterization of all accused products. Mot. 1.

United States District Court
Northern District of California

1    construed at claim construction, the terms should be given their plain and ordinary meaning. *See,*

2    *e.g.,* Mot. 8; Opp. 1-2; Reply 2-3; *see also, Phillips v. AWH Corp.*, 415 F.3d 1303, 1312-13 (Fed.

3    Cir. 2005). The parties' only disagreement concerns whether, in deciding this motion, I must

4    decide precisely what that plain and ordinary meaning is. Motorola argues that I do; Fujifilm

5    contends that I do not.

6          I find that I do not. Motorola's position is essentially that its claim construction arguments

7    should be treated no differently now than if they had been raised during the claim construction

8    process. That process concluded over a year ago, when I issued the claim construction order in this

9    case construing each of the terms selected for construction by the parties. *See* Dkt. No. 66. While

10   district courts "retain discretion to hear belated claim construction arguments," *Boston Scientific*

11   *Corp. v. Johnson & Johnson*, 534 F. Supp. 2d 1062, 1075 (N.D. Cal. 2007), they are not obligated

12   to rule on such arguments when raised for the first time in summary judgment briefs, *Apple, Inc. v.*

13   *Samsung Electronics Co.*, No. 12-cv-00630-LHK, 2014 WL 252045, at *3-5 (N.D. Cal. Jan. 21,

14   2014); *see also, Function Media, L.L.C. v. Google, Inc.*, 708 F.3d 1310, 1325 (Fed. Cir. 2013)

15   ("[T]he denial of a pretrial motion for summary judgment of noninfringement does not, by itself,

16   show that the district court delegated claim construction to the jury.").

17         Motorola relies on *O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*, 521 F.3d 1351 (Fed.

18   Cir. 2008), for the proposition that "[w]hen the parties present a fundamental dispute regarding the

19   scope of a claim term, it is the court's duty to resolve it." *Id.* at 1362. However, as *O2 Micro*

20   recognizes, courts "are not (and should not be) required to construe *every* limitation present in a

21   patent's asserted claims." *Id.* Moreover, this case is different from *O2 Micro*. There, the district

22   court erred by declining to resolve a claim construction dispute the parties raised during claim

23   construction. 521 F.3d at 1361-63. Here, I construed each of the terms selected by the parties

24   during the claim construction process. *See* Dkt. No. 66; *Apple*, 2014 WL 252045, at *3 (N.D. Cal.

25   Jan. 21, 2014) (distinguishing *O2 Micro* on the same ground). Each of Motorola's current claim

26   construction arguments is being raised for the first time now, at summary judgment.

27         This district's patent local rules also weigh against affixing a precise definition to the

28   disputed terms at this time. Rule 4-1 required Motorola and Fujifilm to serve on each other "a list

of claim terms which that party contends should be construed by the Court," and to "meet and confer for the purposes of limiting the terms in dispute by narrowing or resolving differences and facilitating the ultimate preparation" of a joint claim construction statement.  Patent L.R. 4-1.  Rule 4-2 required them to "exchange proposed constructions of each term identified by either party for claim construction" and to identify all intrinsic and extrinsic evidence in support of their proposed constructions.  Patent L.R. 4-2.  Under Rule 4-3(c), Motorola and Fujifilm were then required to submit a joint claim construction statement identifying the no more than ten terms "whose construction will be most significant to the resolution of the case."  Patent L.R. 4-3(c).  The parties complied with this rule and submitted a joint claim construction statement selecting certain terms for construction.  Dkt. No. 38.  They filed claim construction briefs as required by Rule 4-5, and a claim construction hearing was held pursuant to Rule 4-6.  I proceeded to construe the terms identified in the joint claim construction statement based on the parties' claim construction briefs, their submissions of intrinsic and extrinsic evidence, their technology tutorials, and the Rule 4-6 claim construction hearing.  As Judge Koh recently observed, the patent local rules "did not set out a particular process for resolving claim construction disputes only to let the parties make additional arguments at the summary judgment phase untethered to those carefully structured rules."  *Apple*, 2014 WL 252045, at *4 (N.D. Cal. Jan. 21, 2014).

The Federal Circuit recognizes the importance of local procedural rules and "gives broad deference to the trial court's application of [such] rules in view of the trial court's need to control the parties and flow of litigation before it."  *SanDisk Corp. v. Memorex Products, Inc.*, 415 F.3d 1278, 1292 (Fed. Cir. 2005).  Indeed, in *San Disk*, the Federal Circuit affirmed the district court's refusal to entertain claim construction arguments made "after relevant cut-off dates under [the Northern District of California's Patent Local Rules] and the trial court's scheduling order."  *Id.* at 1292.

That said, I do not find, as Fujifilm urges, that declining to treat Motorola's claim construction arguments as if they had been raised during the claim construction process means summarily rejecting Motorola's summary judgment motion.  Judge Koh's opinion in *Apple, Inc. v. Samsung Electronics Co.* is again instructive.  She found that claim construction arguments raised

for the first time in summary judgment briefs were untimely but considered the arguments

nonetheless as "'part of the infringement analysis, not part of the claim construction.'"  2014 WL

252045, at *4 (N.D. Cal. Jan. 21, 2014) (quoting *Thorner v. Sony Computer Entm't Am. LLC*, 669

F.3d 1362, 1369 (Fed. Cir. 2012)).  She explained that she would view the parties' disputes over

claim scope

> through the lens of whether a reasonable jury, armed with the Court's claim
> construction as to certain terms and an instruction that the plain and ordinary
> meaning controls as to others, could . . . conclude that the asserted claim reads on
> an accused device . . . Similar to claim construction, in determining whether an
> infringement . . . argument fits within the plain and ordinary meaning of a term,
> the Court reviews the written description and other parts of the specification, as
> those tools may shed contextual light on the plain and ordinary meaning.  But the
> goal . . . is not to complete the Sisyphean task of providing definitive guidance as
> to a term's plain and ordinary meaning.  Instead, the Court must determine
> whether a jury, free to rely on the plain and ordinary meaning of the terms,
> may . . . conclude that the accused devices infringe the asserted claims.

*Id.* at *5 (internal quotation marks, citations, and modifications omitted).

I find this approach persuasive and will follow it here.  In considering Motorola's claim

construction arguments, I will ask whether a juror could reasonably find that the plain and ordinary

meaning of each disputed term reads onto the accused devices.  In determining the plain and

ordinary meaning of each disputed term, I will consider "the written description and other parts of

the specification," which "may shed contextual light on the plain and ordinary meaning."  *Aventis*

*Pharm. Inc. v. Amino Chemicals Ltd.*, 715 F.3d 1363, 1373 (Fed. Cir. 2013).  "The prosecution

history too, as part of the intrinsic record," may help "suppl[y] context to the claim language."  *Id.*

However, this will be the extent of my inquiry.  I will not attempt to "provid[e] definitive guidance

as to [each] term's plain and ordinary meaning."  *Apple*, 2014 WL 252045, at *5 (N.D. Cal. Jan.

21, 2014).

### 2.        Doctrine of Equivalents

The parties dispute whether Fujifilm may assert doctrine of equivalents infringement

theories for the '427 and '763 patents despite failing to disclose such theories in its infringement

1    contentions.[2]  *See* Mot. 13; Opp. 33-34.  Fujifilm concedes that the doctrine of equivalents theories

2    it now relies on were not adequately disclosed in its infringement contentions but requests leave to

3    amend under Patent Local Rule 3-6.[3]  *See* Opp. 33-34.

4         Fujifilm contends that amendment is warranted on two grounds.  First, according to

5    Fujifilm, Motorola did not clearly set forth its noninfringement positions until recently.  On July

6    18, 2014, the last day of fact discovery, Motorola served an interrogatory response summarily

7    listing claim limitations it contended were missing from the accused products.  *See* Snodgrass Decl.

8    Ex. 30 at 7-12 (Dkt. No. 167-40).  On September 19, 2014, two weeks before the deadline for

9    opening expert reports, Motorola served a supplement to this interrogatory response describing its

10   noninfringement positions in slightly more detail.  *See* Snodgrass Decl. Ex. 31 at 12-16 (Dkt. No.

11   167-41).  Fujifilm states that this was the first time it realized that Motorola's noninfringement

12   positions would potentially require Fujifilm to rely on the doctrine of equivalents.  *See* Opp. 34.

13   Fujifilm's second asserted ground for amendment is that, to the extent that I find that Motorola's

14   claim construction arguments have merit, I will have, in effect, construed the asserted claims in a

15   way that is contrary to Fujifilm's understanding of their plain and ordinary meaning.  Patent Local

16   Rule 3-6 identifies "[a] claim construction by the Court different from that proposed by the party

17   seeking amendment" as one circumstance that may support a finding of good cause for amendment

18   of infringement contentions.  Patent L.R. 3-6(a).

19        Amendment of infringement contentions requires a showing of "good cause."  Patent L.R.

20   3-6.  This requires the party seeking leave to amend to show that it "acted with diligence in

21   promptly moving to amend when new evidence [was] revealed."  *O2 Micro*, 467 F.3d at 1363.  If

22   the party makes this showing, the court must then determine whether the nonmoving party would

23   suffer "undue prejudice" if the motion were granted.  Patent L.R. 3-6.  The court only proceeds to

24

25   _____

     [2] Fujifilm does not seek to assert doctrine of equivalents theories regarding the '285, '886, or '119
26   patents.  *See* Opp. at 25, 33-34.

27   [3] Fujifilm does not clarify whether it requests leave to amend for the purpose of adding even more
     doctrine of equivalents theories to its infringement contentions, or rather whether it requests leave
28   to amend as a means of receiving post hoc authorization to assert the doctrine of equivalents
     theories already included in its expert's report.  *See* Opp. 33-34.  I construe the request as the latter.

United States District Court
Northern District of California

consider prejudice to the nonmoving party if the moving party is able to demonstrate diligence. *Apple, Inc. v. Samsung Electronics Co.*, No. 11-cv-01846-LHK, 2012 WL 1067548, at *2 (N.D. Cal. Mar. 27, 2012); *Acer, Inc. v. Tech. Properties Ltd.*, No. 08-cv-00877-JF, 2010 WL 3618687, at *3 (N.D. Cal. Sept. 10, 2010).  Where the moving party was not diligent, "the inquiry should end." *Apple Inc. v. Samsung Electronics Co.*, No. 12-cv-00630-PSG, 2013 WL 3246094, at *1 (N.D. Cal. June 26, 2013).  "Non-exhaustive examples of circumstances that may, absent undue prejudice to the non-moving party, support a finding of good cause include . . . [a] claim construction by the Court different from that proposed by the party seeking amendment."  Patent L.R. 3-6.

Fujifilm's first argument is unconvincing.  *Apple Inc. v. Samsung Electronics Co.* is once again instructive.  There, Samsung requested leave to add doctrine of equivalents theories to its infringement contentions, arguing that it would have added them sooner except that Apple "failed to provide sufficient noninfringement theories."  2013 WL 3246094, at *2 (N.D. Cal. June 26, 2013).  The court rejected this argument, reasoning that "deficiencies in Apple's noninfringement theories do not justify Samsung's delay in asserting all of the infringement theories it reasonably believed it could assert."  *Id.* at *4.  The court explained that "DOE contentions are not dependent on the opposing party's noninfringement theories."  *Id.*  The patent local rules do not require the disclosure of noninfringement theories; "nor do they provide that a party's failure to disclose noninfringement theories justifies amendment to include DOE theories."  *Id.*  The court continued:

> The purpose of infringement contentions further undercuts Samsung's argument. Infringement contentions serve as substitutes for interrogatories, but they also act as forms of pleading that disclose the parties' theories of their case and thereby shape discovery and the issues to be determined at trial.  Parties accordingly need not "prove up" their theories by providing evidence beyond the material they have at the time they make their contentions.  On the other hand, parties should proffer all of the theories of infringement that they in good faith believe they can assert. As with other forms of pleadings, the infringement contentions should become more specific and fine-tuned as the case progresses, not more sprawling and encompassing.  Nothing in this process . . . suggests that infringement contentions are intended to be a running dialogue between the parties.

*Id.* at *3.  Finding that Samsung had "not explained why it has a good faith basis to assert DOE theories only now," the court denied Samsung's request to amend its infringement contentions on the basis of the asserted inadequacies in Apple's noninfringement positions.  *Id.* at *4.

1    Here also, Fujifilm has failed to show that it previously lacked a good faith basis to assert

2   its doctrine of equivalents theories.  The theories are based on the same structures in the same

3   products that Fujifilm has for months asserted literally infringe.  The only difference is that

4   Fujifilm now contends that these structures, in addition to literally infringing, possess insubstantial

5   differences with the disputed claim limitations and/or perform substantially the same function in

6   substantially the same way to obtain substantially same result.  *See, e.g.,* Castleman Decl. ¶¶ 51,

7   55, 59, 64, 70, 96.  Fujifilm offers no explanation of why these theories could not have been

8   reasonably asserted at the beginning of this case, except to blame Motorola's failure to raise its

9   noninfringement theories earlier.  But "deficiencies in [Motorola's] noninfringement theories do

10   not justify [Fujifilm's] delay in asserting all of the infringement theories it reasonably believed it

11   could assert."  2013 WL 3246094, at *4 (N.D. Cal. June 26, 2013).  Accordingly, Fujifilm's first

12   argument does not establish good cause for amendment.

13    Fujifilm's second argument fails because it is moot.  There is some force to the concept that

14   good cause for amendment will exist if I rule in Motorola's favor on any of its claim construction

15   positions and hold that one or more of Fujifilm's infringement theories is based on an unreasonable

16   understanding of the plain and ordinary meaning of the claim terms, because I will have, in effect,

17   construed those terms in a manner that is materially "different from that proposed by" Fujifilm.

18   *See* Patent L.R. 3-6(a).  However, as discussed in detail below, the only meritorious claim

19   construction position raised by Motorola concerns the term "pixels of the same color" in claim 1 of

20   the '427 patent.  And even if Fujifilm is allowed to rely on its expert's equivalency opinion

21   regarding claim 1 of the '427 patent, that opinion is insufficient to defeat summary judgment.

22    To satisfy its burden of production at this juncture, Fujifilm must provide "particularized

23   testimony and linking argument on a limitation-by-limitation basis that create[s] a genuine issue of

24   material fact as to equivalents."  *AquaTex*, 479 F.3d at 1328-29.  It has not done so.  Its expert, Dr.

25   Kenneth Castleman, asserts that the accused products infringe claim 1 of the '427 patent under the

26   doctrine of equivalents.  *See, e.g.,* Castleman Decl. ¶¶ 51, 55, 59, 64, 66, 70, 72, 77.  But the most

27   detail that Dr. Castleman provides regarding equivalency is to state that, to the extent the accused

28   products do not literally "averag[e] pixel data of the first image data with a weight corresponding to

United States District Court
Northern District of California

a spatial distance between adjacent pixels of the same color," the accused products are only insubstantially different because in the accused products, "the output pixel values are calculated using nearby input pixel values, where the nearest input pixels are weighted more heavily than more distant ones." *See, e.g.,* Castleman Decl. ¶¶ 51, 59, 64, 70. While this testimony speaks to how the accused products average pixel data according to the "spatial distance between adjacent pixels," it says nothing about how the accused products operate on "pixels of the same color." Dr. Castleman offers no testimony regarding equivalency for this limitation, and Fujifilm offers no explanation as to why his testimony is sufficiently particularized to defeat summary judgment despite failing to address it. *See* Opp. 8-9, 33-34. Nor does Fujifilm point to any other evidence in support of a doctrine of equivalents theory for "pixels of the same color." *See id.* On this record, a jury asked to determine whether the accused products meet the "pixels of the same color" limitation under the doctrine of equivalents would be "more or less put to sea," *Lear Siegler, Inc. v. Sealy Mattress Co. of Michigan*, 873 F.2d 1422, 1425-26 (Fed. Cir. 1989), "left to its own imagination on the technical issue of equivalency," *Malta v. Schulmerich Carillons, Inc.*, 952 F.2d 1320, 1327 (Fed. Cir. 1991).

In sum, Motorola's alleged delay in setting forth its noninfringement positions does not create good cause for amendment, and Dr. Castleman's equivalence opinion regarding claim 1 of the 427 patent is not the sort of "particularized testimony and linking argument on a limitation-by-limitation basis" necessary to create a triable issue of fact regarding infringement under the doctrine of equivalents. *See AquaTex*, 479 F.3d at 1328-29. Fujifilm's request to amend its infringement contentions is DENIED. It will not be permitted to assert doctrine of equivalents theories at trial.

**B.    '427 Patent**

**1.    Background**

The '427 patent is directed to a digital camera in which the image captured by the camera's image sensor and stored as a photograph is high-resolution (i.e., consists of relatively many pixels) but the image displayed by the camera viewfinder or other associated monitor is low resolution (i.e., consists of relatively few pixels). '427 patent 1:50-2:15; Fujifilm Claim Construction Brief at

United States District Court
Northern District of California

1   1-2 (Dkt. No. 45).  One way to reduce an image from high to low resolution – or to "thin"[4] it – is to

2   eliminate pixels evenly throughout the image.  Castleman Decl. ¶ 10 (Dkt. No. 166-6).  Another

3   way is to calculate an average for several pixels from the high resolution image to produce data for

4   one pixel from the low resolution image.  *Id.*  The disclosed embodiments of the '427 patent

5   combine these approaches to "thinning" by first eliminating every other row of pixels in the high

6   resolution image, and then calculating averages of the remaining pixels.  *See, e.g.,* '427 patent 8:10-

7   20.

8          Three data formats used to create digital images are relevant to Motorola's motion for

9   summary judgment on the '427 patent: raw, RGB, and luminance/chrominance (or "YCbCr").[5]

10  Mot. 5.  The parties do not dispute the basic functioning of these three data formats.

11         Most image sensors output data in raw format.  The image sensor of a digital camera

12  consists of many individual light sensors, each one representing one pixel.  Fujifilm Tutorial

13  Presentation at 7 (Giardina Decl. Ex. B, Dkt. No. 153-10).  An array of red, green, and blue filters

14  is placed over the light sensors in a predetermined, checkerboard pattern.  The light that reaches a

15  particular light sensor is thus either red, green, or blue, as dictated by the filter above it.  Fujifilm

16  Tutorial Presentation at 8.  The data outputted by the image sensor is then composed of a single

17  value for each pixel, the value representing the intensity of the red, green, or blue light detected by

18  the light sensor.  Bovik Decl. ¶ 22 (Dkt. No. 153-1).

19         RGB format, in contrast, allows for data corresponding to red, green, and blue to be

20  combined within a single pixel.  In RGB format, each pixel has three "components" or "channels,"

21  one for the intensity of red, one for the intensity of green, and one for the intensity of blue.

22  Castleman Decl. ¶ 48.  The three components are then combined to create a particular color.  In

23  many image sensors using RGB format, each component consists of eight bits of data and allows

24  for 256 different values.  In such systems, the total number of distinct colors available by

25  _____

26  [4] At claim construction, I construed "thinning" to mean "reducing the resolution of."  Dkt. No. 66
    at 4-6, 30.

27  [5] Another luminance/chrominance data format is YUV.  The parties agree that the YUV format is
    functionally equivalent to the YCbCr format for the purposes of this motion.  *See* Mot. 12 n.2; Opp.

28  5, 13; Castleman Decl. ¶ 48, 83.

combining the three components is 256 x 256 x 256, or 16.7 million. *See* Castleman Depo. at 57-58 (Trent Decl. Ex. 1, Dkt. No. 155-4). Raw data can be converted into RGB data by a process called "color interpolation" or "demosaicking." *See* Mot. 7; Opp. 6.

The luminance/chrominance or YCbCr format also incorporates three components into each pixel. *See* Castleman Decl. ¶ 48. Instead of red, green, and blue, however, the components represent luminosity – i.e., brightness – and two different measures of "color difference." *See id.* For example, in a common YCbCr system, Y represents the brightness of the pixel, Cb represents the difference between the total brightness of the pixel and the amount of light that is blue, and Cr represents the difference between the total brightness of the pixel and the amount of light that is red. *See id.* Where the chrominance components (i.e., Cb and Cr) are set to the same value for every pixel, the only variance between pixels is in brightness (i.e., Y) and a monochrome image is created.

Both RGB and YCbCr data are sometimes referred to as "composite" image data. The three components of a given pixel in a composite data system can be thought of as three axes in a three-dimensional "color space" which identify a particular color based on where they intersect. *See* Castleman Depo. at 55-57.

Fujifilm asserts only claim 1 of the '427 patent. That claim reads, with emphasis added to the relevant element:

> An electronic still camera comprising:
>
> An imaging device for shooting a subject and outputting a corresponding first color image signal having a high resolution and to be recorded in a recording medium;
>
> **A processing circuit for thinning said first image signal to thereby produce a second image signal having a low resolution, the thinning including averaging pixel data of the first image data with a weight corresponding to a spatial distance between adjacent pixels of the same color;**
>
> An output terminal for outputting said second image signal on a real time basis; and

> A viewfinder, connected to said output terminal, for displaying a color image represented by said second image signal from said output  terminal, and implement by a video monitor

'427 patent 12:41-57.  Motorola contends that it is entitled to summary judgment on the '427 patent because none of the accused products meet the "pixels of the same color" or "spatial distance between adjacent pixels" limitations of the claim.

### 2.      "Pixels of the Same Color"

Motorola argues that Fujifilm's infringement theory for claim 1 of the '427 patent is based on an unreasonable understanding of the plain and ordinary meaning of the term "pixels of the same color."  Mot. 8-12.  In particular, Motorola contends that Fujifilm's infringement theory relies on an unreasonable understanding of "pixel."

The parties agree that in raw data systems, the plain and ordinary meaning of "pixel" is a single point in an image, and that each such point contains a single component of either red, green, or blue, with the value of that component representing the brightness of the red, green, or blue color conveyed by the point.  *See, e.g.,* Opp. 4-5; Fujifilm Tutorial Presentation at 4; Castleman Rpt. 4-5 (Jones Decl. Ex. 2, Dkt. No. 155-6).  The parties further agree that the plain and ordinary meaning of "pixels of the same color" in this context is points in an image which are either all red, all green, or all blue, irrespective of their brightness.  U.S. Patent No. 5,418,565 to Smith, cited on the face of the '427 patent, refers to "pixels of the same color" in this way.  *See* Giardina Decl. Ex. G at 7:5-25 (Dkt. No. 153-15).

The parties disagree on the plain and ordinary meaning of "pixels of the same color" in composite data systems.  As explained above, in composite data systems, each single point in an image contains not one but three components – for example, an R component, a G component, and a B component in an RGB data system, or a Y component, a Cb component, and a Cr component in a YCbCr data system.  Motorola contends that in composite data systems, just as in raw data systems, the plain and ordinary meaning of "pixel" is a single point in an image.  Thus, Motorola contends, "pixels of the same color" in this context means points in an image "having identical coordinates in the color space."  That is, in an RGB data system, "pixels of the same color" would mean points in an image having "identical red values, identical green values, and identical blue

United States District Court
Northern District of California

1  values," and in an YCbCr data system, "pixels of the same color" would mean points in an image

2  having "identical luminance values and color difference values." Mot. 8.  Motorola argues that

3  because it is undisputed that the accused products do not (a) thin raw data, or (b) thin composite

4  data by averaging points in an image "having identical coordinates in the color space," Fujifilm

5  cannot prove literal infringement of claim 1 of the '427 patent.

6      Fujifilm responds that the plain and ordinary meaning of "pixels of the same color" in the

7  context of composite data is not so restricted.  According to Fujifilm, the plain and ordinary

8  meaning of "pixel" in this context is not just a single point in an image, but also the different

9  components, or channels, that comprise that point.  *See* Opp. 4-5.  Thus, Fujifilm asserts, a person

10  of ordinary skill in the art could understand "pixels of the same color" to refer to like components

11  in different image points in a composite data system – for example, the R, G, or B components in

12  different image points in an RGB data system, or the Y, Cb, or Cr components in different image

13  points in a YCbCr data system.  In support of this reading of "pixels of the same color," Fujifilm

14  submits a declaration by its expert, Dr. Castleman, who states:

15      One of ordinary skill in the art at the time of the 427 patent would understand that
16      "adjacent pixels of the same color" refers to nearby input pixels of the same
       channel, whether in the RGB or luminance/chrominance format . . . . "[P]ixels of
17      the same color" means the same of R, G, or B; of Y, Cb, or Cr; or of Y, U, or V.

18  Castleman Decl. ¶ 48 (Dkt. No. 167).

19      As "pixels of the same color" was not construed during claim construction, I give the term

20  the "full range" of its plain and ordinary meaning, *Rexnord Corp. v. Laitram Corp.*, 274 F.3d 1336,

21  1342 (Fed. Cir. 2001), "according to the customary understanding of a person of ordinary skill in

22  the art who reads [it] in the context of the intrinsic record."  *Agilent Technologies, Inc. v.*

23  *Affymetrix, Inc.*, 567 F.3d 1366, 1376 (Fed. Cir. 2009).  For the following reasons, I find that a juror

24  could not reasonably conclude that Fujifilm's reading of "pixels of the same color" fits within this

25  range, and that Motorola is entitled to summary judgment on literal infringement of claim 1 of the

26  '427 patent.

27      No part of the '427 patent's claims, specification, or file history uses "pixels of the same

28  color" in the way that Fujifilm now urges.  In fact, no part of the '427 patent's claims, specification,

18

1    or file history describes the thinning of composite data at all, let alone the thinning of composite

2    data by averaging like components of different image points.  The intrinsic evidence describes only

3    the thinning of raw data.  Claim 6 requires thinning using "pixels of the same color" and describes

4    the high resolution "pixel data" as "consisting of a plurality of predetermined colors repeatedly

5    appearing in a predetermined order."  '427 patent 13:1-10.  Claim 11, which depends from claim 6,

6    further specifies, "said plurality of predetermined colors include at least either a first color

7    representative of red and a second color representative of green, or a second color representative of

8    green and third color representative of blue."  '427 patent 13:37-42.  The summary of the invention

9    likewise describes the "pixel data" on which the invention operates as "consist[ing] of a plurality of

10   predetermined colors repeatedly appearing in a predetermined order."  '427 patent 2:1-10.  The

11   parties do not dispute that this language describes a raw data system, in which the term "pixels of

12   the same color" refers to single image points that are either all red, all green, or all blue.

13        In line with the summary of the invention, the preferred embodiment in the specification

14   operates only on raw data and repeatedly uses "pixels" and "pixel data" to refer to single image

15   points.  Fujifilm notes one instance in which the specification refers to the individual R, G, and B

16   components in an RGB data system as "pixels."  *See* '427 patent 8:55-65.  However, the reference

17   is made in the context of describing color interpolation, not thinning, and does not use the term

18   "pixels of the same color."  *See id.*  As Dr. Castleman admitted at his deposition, the specification

19   consistently (and exclusively) uses "pixels of the same color" to refer to all red, all green, or all blue

20   pixels in a raw data system, not like components in a composite data system.  *See* Castleman Depo.

21   at 114, 116-17.

22        The '427 patent's prosecution history is also devoid of uses of "pixels of the same color" to

23   refer to like components in a composite data system.  When "pixels of the same color" was added to

24   claim 1, Fujifilm stated that it was amending the claim "to more clearly set forth the details of the

25   thinning of the present invention, as disclosed, for example," in the preferred embodiment of the

26   specification, which describes the thinning of raw data.  *See* August 11, 1997 Amendment at 1, 6

27   (Giardina Decl. Ex. F, Dkt. No. 153-14).  Moreover, Fujifilm used "pixel" in the composite data

28   context in precisely the way Motorola contends that a person of ordinary skill in the art would

United States District Court
Northern District of California

19

United States District Court
Northern District of California

1    understand it.  Fujifilm stated:  "The thinned image data are then interpolated by the weighting

2    average means to be converted into simultaneous RGB image data, in which each pixel of data

3    includes R, G, and B component data."  November 27, 1996 Amendment at 12 (Giardina Decl. Ex.

4    D, Dkt. No. 153-12).  While neither of these statements rises to the level of a "clear and

5    unmistakable disavowal" triggering prosecution history estoppel, *Biogen Idec, Inc. v.*

6    *GlaxoSmithKline LLC*, 713 F.3d 1090, 1094-95 (Fed. Cir. 2013), they exemplify that Fujifilm's

7    current understanding of the plain and ordinary meaning of  "pixels of the same color" is not

8    supported by the intrinsic evidence.

9             Of course, neither a patent's specification nor its prosecution history may be used to

10   "narrow a claim term or deviate from the plain and ordinary meaning unless the inventor acted as

11   his own lexicographer or intentionally disclaimed or disavowed claim scope."  *Aventis*, 715 F.3d

12   1363, 1373 (Fed. Cir. 2013).  These circumstances are not present here.  However, the intrinsic

13   evidence described above indicates that Fujifilm, not Motorola, is reading "pixels of the same

14   color" in a way that deviates from its plain and ordinary meaning.  The extrinsic evidence adds

15   further support to this conclusion.  As noted above, the '565 patent to Smith cited on the face of the

16   '427 patent uses "pixels of the same color" to refer to image points in a raw data system which are

17   either all red, all green, or all blue.[6]  Motorola's expert, Dr. Bovik, consistently uses "pixel" to refer

18   to a single image point, not a component of an image point in a composite data system.  *See, e.g.,*

19   Bovik Decl. ¶¶ 21, 23, 32 ("Demosaicking is a way of obtaining image data with values for red,

20   blue, and green at each pixel ('RGB data') from raw data that has data for only one color at each

21   pixel.").  Fujifilm does the same in its tutorial presentation.  *See, e.g.,* Fujifilm Tutorial Presentation

22   at 7, 8, 13, 18, 21, 27, 28.

23

24   [6] "A court in its discretion may admit and rely on prior art proffered by one of the parties, whether

25   or not cited in the specification or the file history.  This prior art can often help to demonstrate how

     a disputed term is used by those skilled in the art . . . As compared to expert testimony, which often

26   only indicates what a particular expert believes a term means, prior art references may also be more

27   indicative of what all those skilled in the art generally believe a certain term means."  *Vitronics*

     *Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1584 (Fed. Cir. 1996).

28

United States District Court
Northern District of California

1      Dr. Castleman states that "pixel" may also refer to a single component in a composite data

2  system, but he provides no basis for this opinion.  The paragraph of Dr. Castleman's declaration

3  excerpted above cites only two sources – both deposition transcripts from this litigation – neither of

4  which supports the assertion that "pixel" is ordinarily used to refer to a component of composite

5  data.  *See* Johnson Depo. at 160 (Snodgrass Decl. Ex. 7, Dkt. No. 167-17); Cheung Depo. at 47

6  (Snodgrass Decl. Ex. 3, Dkt. No. 167-13).  When asked at his deposition whether he could recall

7  any instance in his own published work when he has used "pixel" in this way, Dr. Castleman could

8  not do so.  Castleman Depo. at 118-19.  Rather, Dr. Castleman stated that he does not typically use

9  the word "pixel" to refer to a component of composite data – he typically uses the word "channel."

10  Castleman Depo. at 50.  Dr. Castleman also acknowledged that when a raw data image with, for

11  example, 6 megapixels is interpolated into an RGB data image, the megapixel count of the resulting

12  image is not tripled to 18 megapixels.  Castleman Depo. at 96-97.  Dr. Castleman stated, "No.  It is

13  considered a 6 megapixel RGB color image, with the understanding that each pixel now has three

14  numbers associated with it instead of one."  *Id.*

15      Fujifilm's position is further undermined by Dr. Castleman's published work.  In a treatise

16  published by Dr. Castleman in 1996, he uses "pixel" to mean a single image point in a composite

17  data system, not a component of such a point.  The treatise states in relevant part:

18        [I]t is usually more convenient to treat [a tricolor digital image] as an ordinary . . .
19        image having three gray levels (red, green, and blue) at each pixel.  In other
          contexts, it is more useful to consider it an overlay of three monochrome digital
20        images.

21        [ . . . ]

22        There are several ways one can quantitatively specify a color, such as that of a
23        pixel in a color digital image.  The most straightforward way is to use the red,
          green, and blue brightness values, scaled between, for example, zero and one.  We
24        call this convention the RGB format.  Each pixel – and, indeed, any color it is
          possible to visualize – can be represented by a point in [a three-dimensional color
25        space]."

26  Kenneth R. Castleman, Digital Image Processing (1st ed. 1996) (Kleinman-Green Decl. Ex. A, Dkt.

27  No. 176-2).  Fujifilm seizes on the second sentence of this excerpt, arguing that it demonstrates that

28  Dr. Castleman's current opinion is supported by his published work.  *See* Fujifilm Summary

United States District Court
Northern District of California

1    Judgment Presentation at 17. But the second sentence merely refers to an alternative way of

2    conceptualizing a digital image – it does not state that this other way involves describing an

3    individual component of a given RGB or YCbCr pixel as a "pixel" unto itself.

4         "[E]xpert testimony can be useful to a court for a variety of purposes, such as to provide

5    background on the technology at issue, to explain how an invention works, to ensure that the

6    court's understanding of the technical aspects of the patent is consistent with that of a person of

7    skill in the art, or to establish that a particular term in the patent or the prior art has a particular

8    meaning." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1318 (Fed. Cir. 2005). "However, conclusory,

9    unsupported assertions by experts as to the definition of a claim term are not useful to a court." *Id.*

10   "[A] court should discount any expert testimony that is clearly at odds with the claim construction

11   mandated by the claims themselves, the written description, and the prosecution history, in other

12   words, with the written record of the patent." *Id.* (internal quotation marks omitted); *see also,*

13   *Vitronics*, 90 F.3d at 1584 (holding that "the expert testimony, which was inconsistent with the

14   specification and file history, should have been accorded no weight"). In light of these principles,

15   and because (i) the only instance in the record of the term "pixels of the same color" carrying

16   anything approximating the meaning which Fujifilm now advocates is Dr. Castleman's testimony,

17   (ii) the intrinsic evidence does not support Fujifilm's position, and (iii) apart from Dr. Castleman's

18   testimony, the extrinsic evidence contradicts it, I accord no weight to Dr. Castleman's testimony.

19        Motorola has demonstrated as a matter of law that Fujifilm's understanding of "pixels of the

20   same color" does not fit within the plain and ordinary meaning of that term. Fujifilm concedes that

21   absent this understanding, the accused products do not literally infringe claim 1 of the '427 patent.

22   Accordingly, Motorola's motion for summary judgment of noninfringement of claim 1 of the '427

23   patent is GRANTED.[7, 8]

24   _____

25   [7] Fujifilm contends that Motorola's position regarding "pixels of the same color" is inconsistent
     with the claim construction order in this case. Opp. 8. I disagree. The relevant issue at claim
26   construction was the meaning of "thinning," and in particular whether thinning in the claimed
     invention must occur on raw data before color interpolation into RGB data. Dkt. No. 66 at 4-6.
27   Motorola argued that it must; Fujifilm argued that it need not. I held that it need not. The parties
     did not seek construction of "pixels of the same color," and I did not construe it. The fact that
28   Motorola's current argument regarding "pixels of the same color" is again aimed at rendering the
     accused products noninfringing in part as a result of their not thinning raw data does not make that

United States District Court
Northern District of California

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**C.     '763 Patent**

The relevant claim of the '763 patent describes a method by which a digital camera captures a color image and converts it to monochrome.  *See* '763 patent 13:45-14:5 (Giardina Decl. Ex. K, Dkt. No. 153); Castleman Rpt. at 10.  The parties do not dispute the basic process by which a digital image is converted to monochrome.  In an RGB data system, an image is made monochrome by fixing the R, G, and B components to the same value.  Where the R, G, and B components are all fixed at 0, the image is black.   Where the components are all fixed at 255, the image is white. Values between 0 and 255 generate shades of gray, ranging from black to white.  In a YCbCr system, an image is made monochrome by fixing the color difference components – i.e., the Cb and Cr components – to the same value.  The value of the Y component then controls how dark or light the shade of gray is.  *See, e.g.,* Mot. 17; Castleman Rpt. at 10.

Fujifilm asserts claims 1, 2, 7 and 11 of the '763 patent.  Claims 2, 7, and 11 are dependent on claim 1.  Motorola's summary judgment motion concerns only claim 1, which reads as follows, with emphasis added to the disputed language:

> An apparatus for compressing and coding **image data representative of a color image and including a luminance component and chrominance components**, and outputting resulting coded image data, said apparatus comprising:
>
> a signal processing circuit for processing the image data to output processed image data;
>
> a storage for storing the processed image data and allowing the processed image data to be read out in preselected blocks component by component;
>
> a compression coding circuit for compressing and coding the processed image data read out of said storage component by component to output coded data;
>
> an outputting circuit for outputting the coded data; and
>
> a system controller for controlling said compression coding circuit in accordance with a mode for compressing the image data;

---

argument inconsistent with the claim construction order.

[8] Because I find that Motorola is entitled to summary judgment of noninfringement of the '427 patent based on the "pixels of the same color" limitation, I do not address Motorola's argument regarding the "spatial distance between adjacent pixels" limitation.

**said system controller being operative** in response to a monochrome mode selected for compressing and coding the image data such that the image data render a monochrome image **to fix the chrominance components of the image data to a single, fixed value**, and control said compression coding circuit to compress and code resulting fixed chrominance components and the luminance component.

'763 patent 13:45-14:5.

Fujifilm asserts that the accused products infringe claim 1 in either of two ways. Dr. Castleman states that most of the accused products infringe when they perform a process by which color RGB data is converted directly to monochrome luminance/chrominance data. For example, in certain Motorola phones,



Castleman Decl. ¶ 85. Similarly, in other Motorola phones,



Dr. Castleman states that a minority of the accused products infringe not by converting color RGB data directly to monochrome luminance/chrominance data, but by converting color RGB data to monochrome RGB data, which is then converted to monochrome YCbCr data. Castleman Decl. ¶ 90. In these phones, "[t]he conversion from color to [monochrome] takes place before the conversion from RGB to YCbCr." *Id.* As a result, when the monochrome RGB data is converted to monochrome YCbCr data, the Cb and Cr components are already fixed at the same value. *Id.*

According to Motorola, these infringement theories are deficient as a matter of law because

United States District Court
Northern District of California

United States District Court
Northern District of California

1  claim 1 applies only where the image data being converted to monochrome is in color

2  luminance/chrominance format at the time of conversion – that is, at the time the chrominance

3  component values are fixed to a single value.  *See* Mot. 16-21; Reply 8-11.  The accused products

4  never do this.  They never fix the chrominance components of image data that is, at that exact

5  moment, in color luminance/chrominance format.  Rather the accused products either (a) fix the

6  chrominance component values during the process of converting color RGB data to monochrome

7  luminance/chrominance data, by setting the chrominance component values in the "conversion

8  matrix" to a single value; or (b) fix the chrominance component values during the process of

9  converting color RGB data to monochrome RGB data, which results in fixed chrominance

10 component values when the monochrome RGB data is subsequently converted to monochrome

11 YCbCr data.  *See* Castlemen Decl. ¶¶ 85, 87, 89-90.

12         Motorola's argument that the fixing must occur on data in color luminance/chrominance

13 format is based on claim 1's preamble, which describes "an apparatus for compressing and coding

14 **image data representative of a color image and including a luminance component and**

15 **chrominance components**, and outputting resulting coded image data."  '763 patent 13:48-53

16 (emphasis added).  Motorola argues that this description of "image data" serves as an antecedent

17 for each subsequent use of "image data" in the claim language.  Thus, according to Motorola, the

18 final element of claim 1 should be read to mean, "said system controller being operative . . . to fix

19 the chrominance components of the [color luminance/chrominance data] to a single, fixed value."

20 *See* Mot. 20.

21         This argument falls short for at least two reasons.  First, it is not clear that claim 1's

22 preamble is properly read as limiting the claim.  The general rule is that preamble language is not

23 limiting.  *Aspex Eyewear, Inc. v. Marchon Eyewear, Inc.*, 672 F.3d 1335, 1347-48 (Fed. Cir. 2012);

24 *Allen Eng'g Corp. v. Bartell Indus., Inc.,* 299 F.3d 1336, 1346 (Fed. Cir. 2002).  A preamble may

25 nevertheless be construed as limiting "if it recites essential structure or steps, or if it is necessary to

26 give life, meaning, and vitality to the claim."  *Am. Med. Sys., Inc. v. Biolitec, Inc.*, 618 F.3d 1354,

27 1358 (Fed. Cir. 2010) (internal quotation marks omitted).  Also, "[w]hen limitations in the body of

28 the claim . . . derive antecedent basis from the preamble, then the preamble may act as a necessary

component of the claimed invention." *NTP, Inc. v. Research In Motion, Ltd.*, 418 F.3d 1282, 1306 (Fed. Cir. 2005).  A preamble is not limiting, however, where the claim "describes a structurally complete invention such that deletion of the preamble phrase does not affect the structure or steps of the claimed invention." *Id.* at 1358-59.  Where the preamble is "reasonably susceptible to being construed to be merely duplicative of the limitations in the body of the claim," the Federal Circuit "do[es] not construe it to be a separate limitation." *Biolitec*, 618 F.3d at 1358-59 (internal quotation marks omitted).  Nor is a preamble limiting where it "simply states the intended use or purpose of the invention." *C.R. Bard, Inc. v. M3 Sys., Inc.*, 157 F.3d 1340, 1350 (Fed. Cir. 1998). Whether a preamble constitutes a claim limitation "is determined on the facts of each case in light of the claim as a whole and the invention described in the patent."  *Id.* (internal quotation marks omitted).

These principles weigh against construing claim 1's preamble as limiting.  The claim language describes a  "structurally complete" invention.  *Biolitec*, 618 F.3d at 1359; *see also, Aspex*, 672 F.3d at 1347-48.  Even absent the preamble, the operation of the claimed apparatus and its ultimate effect – i.e., the production of a monochrome image by fixing the chrominance components of image data to a single, fixed value – are clearly set out in the claim.  *See* '763 patent 13:45-14:5.

Further, construing each instance of "image data" in claim 1 to mean "image data representative of a color image and including a luminance/chrominance components" (or "color luminance/chrominance data") would conflict with other parts of the patent.  Under this reading, the first element of claim 1 would require "a signal processing circuit for processing [color luminance/chrominance data]."  *See* '763 patent 13:53-55.  But the description of the preferred embodiment states that the signal processing circuit operates on color RGB data, which the signal processing circuit then converts to luminance/chrominance data.  *See id.* at 4:55-60, 5:5-25.  The figure in the specification displaying the preferred embodiment indicates the same.  The data entering the signal processing circuit is labeled as "RGB" data, while the data exiting the signal processing circuit is labeled as "YC" data, which the specification explains is YCbCr data:

United States District Court
Northern District of California



*See id.* at fig. 1, 5:10-15 ("As a result, luminance data Y corresponding to the RGB color image

signal 100 and chrominance data Cr and Cb having the above fixed value appear on the output 104

of the signal processing 16."). The description of the preferred embodiment goes on to explain that

the signal processing circuit "produces luminance data Y and chrominance data Cb and Cr from the

digital RGB data by calculation." *Id.* at 10:55-65. The upshot is that treating the preamble as a

limitation on each instance of "image data" in the claim would read out the preferred embodiment,

a construction the Federal Circuit has repeatedly warned is "rarely, if ever, correct." *MBO Labs.,*

*Inc. v. Becton, Dickinson & Co.*, 474 F.3d 1323, 1333 (Fed. Cir. 2007).

Reading the preamble to define "image data" throughout claim 1 would also be at odds with

claim 2 of the 763 patent, which is dependent on claim 1 and which reads:

> An apparatus in accordance with claim 1, wherein said signal processing circuit
> transforms an RGB color image signal input thereto to the image data including
> the luminance component and the chrominance components, and fixes the
> chrominance components to the fixed value when the monochrome mode is
> selected.

'763 patent 14:8-13. The language of dependent claim 2 – which specifies that the data inputted

into the "signal processing circuit" must be in RGB format – indicates that the data inputted into

the "signal processing circuit" in claim 1 may be in either RGB or YCbCr (or another) format. *See*

*Douglas Dynamics, LLC v. Buyers Products Co.*, 717 F.3d 1336, 1342 (Fed. Cir. 2013) (affirming

construction of independent claim 1 to "requir[e] the A-frame to support the lift frame in both the

1    mounted and unmounted states" where dependent claim 9 "specifically refers to a state when the A-

2    frame is not connected to the mounting frame;" stating that "the selective reference to the

3    unmounted state in dependent claim 9 implies that claim 1 encompasses both states").

4         Finally, while the reference to "the image data" in the first element of claim 1 does support

5    the notion that the preamble serves as an antecedent to "image data" as used in the claim, this alone

6    does not require that the preamble be read as limiting. *See Biolitec*, 618 F.3d at 1359 (holding that

7    "the preamble term 'photoselective vaporization of tissue' does not provide a necessary antecedent

8    basis for the term 'the tissue' in the . . . claims" where the term "tissue" in the preamble did not

9    "provide any context essential to understanding the meaning of 'the tissue' in . . . each claim").

10   Motorola offers no other ground for construing the preamble as an additional limitation. Given

11   "the facts of [this] case in light of the claim as a whole and the invention described in the patent,"

12   *Biolitec*, 618 F.3d at 1358, the reference to "the image data" does not justify treating the preamble

13   as limiting.[9]

14        The second reason Motorola's reliance on the preamble falls short is that, even assuming

15   the preamble is construed as limiting, Motorola has not demonstrated as a matter of law that this

16   would preclude a finding of infringement. The only limitation which Motorola asserts would not

17   be met under its construction is the requirement of "said system controller being operative . . . to fix

18   the chrominance components of the image data to a single, fixed value." *See* Mot. 20. Even if this

19   limitation were construed as "said system controller being operative to fix the chrominance

20   components of the [color chrominance/luminescence data] to a single, fixed value," a juror could

21   still reasonably conclude that the accused devices, as described by Dr. Castleman, infringe the

22   claim. Contrary to Motorola's assertions, the plain and ordinary meaning of this language does not

23   necessarily require that the image data being converted to monochrome be in color

24

25   _____

26   [9] The facts of this case in light of the claim as a whole and the invention described in the patent also distinguish this case from *Pacing Technologies, LLC v. Garmin International, Inc.*, No. 14-01396 (Fed. Cir. Feb. 18, 2015), which Motorola brought to the Court's attention in a Notice of Supplemental Authority filed February 18, 2015. *See* Dkt. No. 194. There, construing the preamble as limiting aligned with the specification's "clear and unmistakable statement of disavowal" of the patentee's reading of the relevant claim language. *See* Dkt. No. 194 at 7-10. That is not the situation here.

27

28

1    luminance/chrominance format at the time of conversion.  That question remains one of fact, even

2    under Motorola's construction.

3        Motorola does not dispute that, apart from its claim construction argument, there are triable

4    issues of fact regarding whether the accused products infringe each of the asserted claims of the

5    '763 patent.  Accordingly, Motorola's motion for summary judgment on noninfringement of the

6    '763 patent is DENIED.

7    **D.    '285 and '886 Patents (Face Detection Patents)**

8        Fujifilm asserts one claim from each of these patents: claim 1 of the '285 patent and claim

9    11 of the '886 patent.  The patents share a common specification and are directed to a digital

10   camera that can detect whether a face is included in the frame of a moving image.  *See* '285 patent

11   abstract; '886 patent abstract.  The parties do not dispute that claim 1 of the '285 patent and claim

12   11 of the '886 patent are substantially identical and limit their briefing to claim 1 of the '285 patent.

13   *See* Mot. 23; Opp. 20 n.7.  That claim provides in relevant part, with emphasis added to the

14   disputed terms:

15       A photographing apparatus comprising:

16       [ . . . ]

17       a face judgment device for performing processing, at predetermined or varying
18       time intervals, for judging whether **a human face** is included in a frame of the
         moving image;

19
20       a face detection device for detecting a facial position in the frame, in the case that
         the frame has been judged to include **a face** by the face judgment device; and

21
22       a control device for controlling the photographing device, the face judgment
         device, the face detection device, the memory, and the storage so that **a judgment**
23       **is made as to whether the face is included in a first frame of the moving**
         **image, and if the judgment is positive, a first facial position is detected, the**
24       **first facial position is stored in the memory, and judgment is made as to**
         **whether the face is included in a second frame of the moving image** after the
25       predetermined or varying time interval, and if it is judged that the face is included
         in the second frame, a second facial position is detected, and the second facial
26       position is either stored in the memory or replaces the first facial position stored
         in the memory.

27       '285 patent 18:30-65 (Giardina Decl. Ex. M, Dkt. No. 153-21).

28

United States District Court
Northern District of California

1    According to Motorola, a person of the ordinary skill in the art reading this claim language

2    would understand that the claim is "specifically directed to looking for the same face that was

3    previously found." Mot. 23-24. Motorola asks that I construe "and judgment is made as to

4    whether the face is included in a second frame of the moving image" as "and judgment is made as

5    to whether the [previously found] face is included in a second frame of the moving image." *Id.*

6    Motorola contends that because Fujifilm has not produced evidence showing that the accused

7    devices "look for specific faces or tailor the detection to take into account whether or not a face

8    was previously found," summary judgment is warranted on the face detection patents. *Id.*

9    In addition to the word "the" in the claim language, Motorola points to figure 12 in the

10   specification:



FIG.12

27   '285 patent fig. 12. Figure 12 displays a process for optimizing face detection where there is

28   minimal change between an initial frame in which a face is detected and a subsequent frame. The

process performs an analysis of the two frames and calculates the variance between them.  If the variance is below a certain threshold, the search for a face in the subsequent frame is limited to the area where the previously detected face was located.  But if the variance is above the threshold, the whole frame is searched.  *See* '285 patent 16:25-60.  Motorola contends that this portion of the specification demonstrates that "Fujifilm is not claiming the banal process of performing face detection on frame after frame, but [the] advantageous process of limiting the search to account for the previous detection."  Mot. 24-25.

I am not convinced that either the word "the" in the claim or figure 12 in the specification (or the combination of the two) provides a sufficient basis for inserting "previously found" into the claim, thereby transforming what both parties describe as a face detection patent into a face recognition patent.  *See, e.g.,* Mot. 22.  Although the face-detection-optimization process displayed in figure 12 does involve an analysis of whether a face in a second frame is in the same or a similar position as a face in the first frame, the process does not require that the face appearing in the second frame be the same face that appeared in the first frame.  The specification describes the relevant steps in figure 12 as follows:

> If step 19 is NO, the CPU 12 judges that the scene is not switched between the two frames of the frame Fri and the frame Fri + 1, and reads out the information Pi about the facial position . . . (step S20).  Regarding the frame Fri + 1, the CPU 12 performs judgment processing only on the facial position, detected in the frame Fri, and the vicinity of the facial position, to judge whether **a face** is included in the frame Fri + 1 (step 21).  If it is judged that **a face** is not included, processing goes back to step S13.  If it is judged that **a face** is included, the processing goes back to step S14, and the facial position is detected.

'285 patent 16:45-60 (emphasis added).  By the plain language of the specification, the process searches for "a face" in the area where the previously detected face was located.  It does not search for "the previously found face," as Motorola urges.  In any event, the face-detection-optimization process is not described in claim 1 or in any of the other claims of either the '285 or the '886 patent.

Other parts of the specification likewise describe the claimed invention as detecting any face in subsequent frames of a moving image, not a previously found face.  The abstract states in relevant part:

> Processing for judging whether **a face** is included in a frame is performed, in a predetermined interval, on each of the frames included in a moving image of **a subject**, displayed on a monitor, until the judgment becomes positive.  If it is judged that **a face** is included in a frame, the facial position is detected in the frame, and stored.  Then, judgment is made as to whether **a face** is included in the next frame after predetermined time.

'285 patent abstract (emphasis added).  Similarly, the specification describes the initial steps displayed in figure 12 as follows:

> If it is judged that a face is included, the facial position is detected (step S14), and the information Pi, which represents the facial position, is stored in the system memory (step S15).  Then, the CPU 12 judges whether the user has performed the photographing operation by pressing the release button (step S16).  If step S16 is NO, the CPU 12 changes the processing object to the next frame, which is a frame after predetermined time (step S17) . . . . [P]rocessing returns to step S12 so that the processing for judging whether **a face** is included is performed on the whole frame Fri + 1 in a similar manner to the processing as described above.

'285 patent 16:30-50.

In light of the specification's repeated descriptions of the claimed invention as detecting whether a face (any face) appears in subsequent frames of a moving image, a juror could reasonably find that the plain and ordinary meaning of claim 1 reads onto the accused products, despite the fact that they do not seek out previously detected faces.[10]  Motorola's motion for summary judgment of noninfringement of the '285 and '886 patents is DENIED.

### E.     '119 Patent

Unlike the other asserted patents, the '119 patent does not concern digital camera technology.  The '119 patent describes a wireless telephone that communicates both over a cellular network operated by a provider (such as AT&T or Verizon) and over a wireless channel without

---

[10] Moreover, even if the plain and ordinary meaning of claim 1 were as narrow as Motorola contends, Fujifilm has produced evidence showing that a juror could still reasonably find infringement.  This is because in most cases, the face that an accused device detects in the first frame will be the same face that the accused device detects in the next frame.  *See, e.g.,* Castleman Decl. ¶ 138 ("[I]f a face is found at a particular location in one frame, and a face is found at the same or a nearby location in a subsequent frame . . . it is quite likely to be the same person."); *see also, Hilgraeve Corp. v. Symantec Corp.*, 265 F.3d 1336, 1343 (Fed. Cir. 2001) ("[A]n accused device may be found to infringe if it is reasonably capable of satisfying the claim limitations, even though it may also be capable of noninfringing modes of operation."); *Rambus Inc. v. Hynix Semiconductor Inc.*, 642 F. Supp. 2d 970, 988 (N.D. Cal. 2008) ("That the accused devices occasionally fail to meet this limitation does not defeat the devices' infringement at other times.").  Motorola does not contend otherwise in its reply brief.  *See* Reply 11-12.

any provider (such as Bluetooth or WiFi).  *See* '119 patent 1:48-68, 2:1-5; Haeberli Decl. ¶ 30.

This functionality enables the telephone to receive data from a cellular network and to then transmit

the data over a providerless channel to a device such as a computer or printer.  *See id.*  Fujifilm

asserts claims 1, 13, and 35 of the '119 patent.  Motorola moves for summary judgment of

noninfringement on each of these claims.

<div style="text-align:center">

**a.**     **Claims 1 and 35**

</div>

Claim 1 of the 119 patent provides in relevant part:

A data transmission system comprising:

a wireless telephone that receives data of at least one of an image and characters
through a transmitting provider;

**a designating device on said wireless telephone for designating the data for
reception by the wireless telephone and for selectively designating an
apparatus to which the received data is to be transmitted.**

[ . . . ]

'119 patent 4:30-40 (emphasis added).  Claim 35 includes the same "designating device" limitation

as claim 1.  *Id.* at 9:42-48.  Motorola argues that this limitation restricts the scope of the claims to

wireless telephones which (a) receive the designated data and then (b) transmit the designated data

to the designated apparatus (c) without storing the designated data on the wireless telephone.  Mot.

26.  In contrast, the Motorola phones use "store-and-forward data retransmission" – that is, they

download a file using a cellular connection, store the file on the phone, and then retransmit the file

to another device using, e.g., Bluetooth or WiFi.  Motorola argues that claims 1 and 35 cannot be

read to cover store-and-forward data retransmission because Motorola disclaimed such

functionality during prosecution.  Mot. 26-29.

Fujifilm does not dispute that if the "designating device" limitation is construed to exclude

store-and-forward data retransmission, the accused products do not infringe.  *See* Opp. 26-29.

Fujifilm contends instead that the prosecution history cited by Motorola is an insufficient basis for

narrowing the claims in this way.  The parties' dispute thus turns on the 119 patent's prosecution

history and its effect on the claims' scope.

<div style="text-align:center">

33

</div>

"The words of a claim are generally given their ordinary and customary meaning as understood by a person of ordinary skill in the art when read in the context of the specification and prosecution history." *Thorner v. Sony Computer Entm't Am. LLC*, 669 F.3d 1362, 1365 (Fed. Cir. 2012). One exception to this general rule is where the patentee "disavows the full scope of a claim term . . . during prosecution." *Id.* "[A] clear and unmistakable disavowal during prosecution overcomes the heavy presumption that claim terms carry their full ordinary and customary meaning. Thus, when the patentee unequivocally and unambiguously disavows a certain meaning to obtain a patent, the doctrine of prosecution history disclaimer narrows the meaning of the claim consistent with the scope of the claim surrendered." *Biogen Idec, Inc. v. GlaxoSmithKline LLC*, 713 F.3d 1090, 1094-95 (Fed. Cir. 2013) (internal quotation marks and citations omitted). "Where an applicant's statements are amenable to multiple reasonable interpretations, they cannot be deemed clear and unmistakable." *3M Innovative Properties Co. v. Tredegar Corp.*, 725 F.3d 1315, 1326 (Fed. Cir. 2013); *see also, Finjan, Inc. v. Blue Coat Sys., Inc.*, No. 13-cv-03999-BLF, 2014 WL 5361976, at *6 (N.D. Cal. Oct. 20, 2014) (noting that "disavowal of claim scope must be clear and unambiguous and not subject to more than one reasonable interpretation") (internal quotation marks and citations omitted).

Claims 1-3, 7 and 8 of the 119 patent, each of which include the same designating device limitation at issue here, were initially rejected as obvious. In distinguishing the prior art cited by the examiner, Fujifilm stated that its claimed invention was different because it could "receive the data and transmit the data to an apparatus <u>even if the telephone cannot store all of the data or display the image . . . due to the small recording capacity or poor performance of the displaying device of the telephone.</u>" April 30, 2004 Amendment under 37 C.F.R. § 1.11 (Giardina Decl. Ex. O at 547) (underline in original). Fujifilm asserted that

> choosing which messages to read from a list of messages, such as text messages, and subsequently forwarding the text messages to another phone after the entire message is received by the portable phone is completely different than "a detector for detecting the data <u>to be received</u> from the transmitting provider" and "a designating device for <u>designating the data for reception</u> by the wireless telephone from the transmitting provider <u>and</u> for selectively <u>designating an apparatus</u> to which the received data is to be transmitted."

United States District Court
Northern District of California

*Id.* at 546-47 (underline in original).

Fujifilm then highlighted for a second and time the storage and display problems the claimed invention was designed to address:

> [B]y permitting the user to designate <u>data for reception</u> by the wireless telephone prior to receipt of the data from the transmitting provider and to selectively designate an apparatus to which the received data is to be transmitted, the claimed invention overcomes the conventional problems associated with small recording capacity or poor performance of the displaying device of the wireless telephone.

*Id.* at 547 (underline in original).

Finally, Fujifilm spelled out the differences between "Swartz" and "Sashira," the invalidating references, and the claimed invention:

> [B]y merely selecting text messages to read and subsequently forwarding such text messages to another telephone, Swartz is not capable of receiving and transmitting data to the apparatus <u>even if the telephone cannot store all of the data or display the image of high quality due to the small recording capacity or poor performance of the displaying device of the telephone.</u>
>
> [ . . . ]
>
> [A]ny combination of Swartz and Sashihara still could not provide one of the advantages of the claimed invention, such as receiving the data and transmitting the data to an apparatus <u>even if the telephone cannot store all of the data or display the image of high quality due to the small recording capacity or poor performance of the displaying device of the telephone.</u>
>
> [ . . . ]
>
> [C]ombining [Swartz and Sashihara] still <u>would result in a device with limited storing capacity,</u> and thus, <u>would not provide any of the disclosed advantages of the claimed invention.</u>

*Id.* at 548-49 (underline in original).  Motorola asserts that "in view of the explicit statements distinguishing the claimed inventions of the '119 patent from the store-and-forward retransmission functionality present in prior art telephones, Fujifilm is legally precluded from recapturing that same functionality in its infringement allegations."  Mot. 29.

I am not persuaded that Fujifilm's statements rise to the level of a clear and unmistakable disavowal of all store-and-forward retransmission functionality.  Motorola has not identified any

United States District Court
Northern District of California

1    instance in which Fujifilm unambiguously states that the claimed invention does not store the

2    designated data on the wireless telephone.  In all but one of the statements highlighted by Motorola,

3    Fujifilm merely asserts that the claimed invention addresses the problems of "small recording

4    capacity" and/or "poor performance of the displaying device of the wireless telephone."  While

5    there is an obvious connection between the problem of "small recording capacity" and an invention

6    that eschews store-and-forward retransmission functionality, neither Fujifilm nor the examiner ever

7    draws that connection with any level of clarity.  This absence of a clearly drawn connection

8    between the problem of "small recording capacity" and store-and-forward retransmission

9    functionality renders the statements too ambiguous to trigger prosecution history disclaimer.  This

10   is especially so given that the portion of Swartz relied on by the examiner in rejecting claims 1-3, 7

11   and 8 does not plainly disclose store-and-forward retransmission functionality, and the examiner

12   does not describe Swartz as doing so.  *See* April 30, 2004 Amendment under 37 C.F.R. § 1.11 at

13   502-03.  The examiner likewise describes Sashihara as disclosing a wireless connection between the

14   wireless telephone and the designated apparatus, not store-and-forward retransmission functionality.

15   *See id.*

16        In the other statement highlighted by Motorola, Fujifilm distinguishes between the claimed

17   invention and "choosing which messages to read from a list of messages, such as text messages, and

18   subsequently forwarding the text messages to another phone after the entire message is received."

19   April 30, 2004 Amendment under 37 C.F.R. § 1.11 at 546-47.  Motorola asserts that this statement

20   was intended to distinguish the prior art phones on the ground that such phones receive "the entire

21   message."  Reply 14.  According to Motorola, this is equivalent to distinguishing the prior art

22   phones on the ground that they employ store-and-data retransmission.  But that is not at all clear

23   from the actual language of the statement.  Moreover, Fujifilm offers an alternative interpretation of

24   the statement.  Fujifilm asserts that it was intended to distinguish only the text messaging

25   functionality of the prior art phones.  Specifically, the claimed invention "designat[es] the data for

26   reception," while text messages are received without designation on the receiving phone, and the

27   claimed invention retransmits to an "apparatus" or device, while text messages are retransmitted to

28   a phone number, not a device.  *See* Opp. 28; Haeberli Decl. ¶ 67.  Motorola does not provide any

reason this interpretation of the statement is unreasonable.

Further, the notion that claims and 1 and 35 do not extend to store-and-forward retransmission functionality finds virtually no support in the '119 patent itself. Motorola does not identify any language in claims 1 or 35 indicating that they do not extend to store-and-forward retransmission functionality. If anything, the references in the "designating device" limitation to "reception" and "received data" indicate that the claimed system does involve storing the data to be transmitted. *See* '119 patent 4:38-43. Motorola emphasizes that the specification states that the invention was developed to address the problem that existing wireless telephones could not "display and store an image of high quality due to [their] small recording capacity and poor performance." Reply 12 (quoting '119 patent 1:33-38). But this vague reference to a problem the invention was designed to address does not support imposing a limitation that finds no basis in the actual claim language. *See MBO Labs., Inc. v. Becton, Dickinson & Co.*, 474 F.3d 1323, 1330-31 (Fed. Cir. 2007) ("[W]e cannot endorse a construction analysis that does not identify  a textual reference in the actual language of the claim with which to associate a proffered claim construction.") (internal quotation marks omitted); *Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1248 (Fed. Cir. 1998) ("[I]t is manifest that a claim must explicitly recite a term in need of definition before a definition may enter the claim from the written description."). Motorola identifies nothing else in the specification that supports its position.

Moreover, claim 13 of the '119 patent explicitly discloses the exact limitation which Motorola seeks to insert into claims 1 and 35. The claim discloses a "wireless telephone [that] receives and transmits the data **without storing the entire data set on the wireless telephone**." '119 patent 6:35-50 (emphasis added). This language demonstrates that Fujifilm knew how to explicitly disavow store-and-forward functionality. *See Enzo Biochem, Inc. v. Applera Corp.*, 599 F.3d 1325, 1333 (Fed. Cir. 2010) (finding "no basis to read a 'hybridization' requirement into the claims of the '928 patent" where "[t]he applicants knew how to claim a linkage group that does not substantially interfere with hybridization, as they did in the '824 and '767 patents, but specifically omitted that language from the claims of the related '928 patent"). Fujifilm did not do so in claims

37

United States District Court
Northern District of California

1 and 35, a fact which the examiner was presumably aware of when it approved those claims.[11]

Despite the '119 patent's prosecution history, a juror could reasonably conclude that the plain and ordinary meaning of claims 1 and 35 extends to devices employing store-and-forward retransmission.  Motorola's motion for summary judgment of noninfringement of these claims is DENIED.

### b.     Claim 13

Motorola argues that it is entitled to summary judgment of noninfringement on claim 13 because Fujifilm has failed to provide sufficient evidence of infringement of the claim's "transmitting and receiving buffer coupled to said first transmitting and receiving circuit" and "designated apparatus" limitations.  Mot. 29.  Claim 13 provides, with emphasis added to the relevant limitations:

> A data transmission system comprising:
>
> at least one wireless telephone comprising:
>
> a first wireless communication device for receiving data;
>
> a first transmitting and receiving circuit coupled to said first wireless communication device;
>
> a **transmitting and receiving buffer coupled to said first transmitting and receiving circuit** for temporarily storing said data;
>
> a second transmitting and receiving circuit coupled to said transmitting and receiving buffer; and
>
> a second wireless communication device coupled to said second transmitting and receiving circuit for transmitting the data to a **designated apparatus** without a transmitting provider;

---

[11] Motorola is correct that Federal Circuit "cases make clear . . . that where found, prosecution history disclaimer can overcome the presumption of claim differentiation."  *Biogen Idec, Inc. v. GlaxoSmithKline LLC*, 713 F.3d 1090, 1097 (Fed. Cir. 2013); *see also, Regents of Univ. of Cal. v. Dakocytomation Cal., Inc.*, 517 F.3d 1364, 1375 (Fed. Cir. 2008) ("[T]he presumption created by the doctrine of claim differentiation is "not a hard and fast rule and will be overcome by a contrary construction dictated by the written description or prosecution history.").  However, because Fujifilm's statements during prosecution do not rise to the level of a clear and unmistakable disavowal, those cases do not support a finding of prosecution history disclaimer here.

1    wherein said wireless telephone receives and transmits the data without storing
2    the entire data set on the wireless telephone.

3    '119 patent 6:35-55.  I address each limitation in turn.

4    **1.    Transmitting and Receiving Buffer Coupled to Said First Transmitting and Receiving Circuit**

5    Motorola contends that Fujifilm has failed to specifically identify any component within the

6    accused phones that corresponds to the "transmitting and receiving buffer" limitation in claim 13.

7    Motorola further argues that Fujifilm has not produced sufficient evidence of how any "transmitting

8    and receiving buffer" within the accused devices is "coupled" to a "transmitting and receiving

9    circuit."  Mot. 31.

10   Regarding the "transmitting and receiving buffer" limitation, Fujifilm's expert, Martin

11   Haeberli, states in his declaration that "the volatile RAM of each Accused Motorola Hotspot Phone

12   acts as a transmitting and receiving buffer by holding the received data and temporarily storing the

13   hotspot data until it can be transmitted."  Haeberli Decl. ¶ 48.  In support of this statement, Haeberli

14   cites various portions of the deposition transcripts of three different Motorola employees.[12, 13]  *Id.*

15   In line with his declaration, Haeberli testified at his deposition that the RAM in the Motorola

16   phones meets the "transmitting and receiving buffer" limitation.  *See* Haeberli Depo. at 247-48

17   (Snodgrass Decl. Ex. 26, Dkt. No. 167-36).  Haeberli explained that his opinion is based on his

18   review of the documents produced in this case, his review of relevant source code, and his review

19   and use of the accused phones.  *See id.*

20   Motorola's expert, Dr. Bims, has a different opinion.  He states that the RAM in the accused

21   phones "temporarily stor[e] data to be processed, contrary to the claimed transmitting and receiving

22   buffer, which temporarily stores data to be transmitted."  Bims Decl. ¶ 84 (underline in original).

23

24   _____

[12] Motorola objects to this deposition testimony in order to "[p]reserve objections made on the record during the depositions."  Reply 19.

25

[13] Haeberli also cites two block diagrams produced by Motorola, both of which indicate that the
26   accused phones contain RAM.  *See* Haeberli Decl. ¶ 38 n.9; Snodgrass Decl. Exs. 17-18 (Dkt. Nos. 167-27, 167-28); *see also,* Haeberli Depo. 185 ("[T]he RAM component that I'm identifying . . . is
27   the RAM that's in each of the accused devices based upon, among other things, my review of [Motorola's] block diagrams.").  Motorola objects to the diagrams on the ground that Haeberli "has never before cited these two documents."  Reply 20.  Haeberli cites both documents in Exhibit B of
28   his opening expert report.  *See* Haeberli Decl. ¶ 37 n.7, Ex. B.  The objection is OVERRULED.

United States District Court
Northern District of California

1    Dr. Bims cites the same deposition transcripts as Haeberli but apparently reads them differently.

2    *See id.* at ¶¶ 84-85.

3           The experts' competing opinions regarding the operation of the RAM in the Motorola

4    phones is sufficient to create a genuine dispute of material fact.  *See Apple*, 2014 WL 252045, at

5    *11 (N.D. Cal. Jan. 21, 2014) (denying summary judgment on noninfringement where the

6    "disagreement between the parties' experts constitutes a genuine dispute as to the application of . . .

7    'analyzer server' to the accused products, one that this Court cannot resolve at summary

8    judgment").  Accordingly, Motorola's motion for summary judgment on claim 13 on the ground

9    that the accused phones do not contain a "transmitting and receiving buffer" is DENIED.

10          Regarding the "coupled" limitation, Haeberli states in his declaration that the relevant

11   components in the accused phones are "coupled together . . . allowing the data to flow from the

12   [cellular] network through the phone to the [wireless network]."  Haeberli Decl. ¶ 47.  Haeberli

13   testified at his deposition that he reached this conclusion based on his review of the block diagrams

14   produced by Motorola and certain deposition testimony, as well as his own operation of the accused

15   devices.  Haeberli Depo. at 248-49.

16          Motorola argues that Haeberli's statements are too "conclusory and unsubstantiated" to

17   create a triable issue of fact.  Mot. 32-33.  The only evidence that Motorola offers in support of this

18   argument, however, are excerpts from Haeberli's own deposition testimony.  *See* Mot. 32-33; Reply

19   16-18.  In one, Haeberli acknowledges that the block diagram being shown to him at that moment

20   does not show "direct coupling."  Haeberli Depo. at 206-07.  In another, Haeberli admits that in

21   reaching his opinion on the "coupling" limitation, he did not analyze the actual circuitry of the

22   processing chips in the accused phones.  *See* Haeberli Dep. at 203-04.  These excerpts may provide

23   fodder for cross examination, but they do not render Haeberli's opinion incapable of supporting a

24   valid finding of infringement.  Motorola does not explain why the block diagrams or the deposition

25   testimony that Haeberli states he relied on fail to corroborate his opinion.  *See* Mot. 32-33; Reply

26   16-18.  Nor, for that matter, does Motorola explain why Haeberli's opinion is wrong – that is, why

27   "coupling" cannot be found in the accused phones.  *See id.*

28          Fujifilm is not required to conclusively demonstrate the presence of "coupling" to defeat

United States District Court
Northern District of California

United States District Court
Northern District of California

1    summary judgment; all that is required is sufficient evidence to create a genuine issue of material

2    fact.  *See Liberty Lobby*, 477 U.S. at 248-49.  Haeberli's opinion is neither too conclusory nor too

3    unsubstantiated to satisfy this burden.  Accordingly, Motorola's motion for summary judgment of

4    noninfringement on claim 13 on the ground that the accused phones do not meet the "coupling"

5    limitation is DENIED.

6                                    **2.        "Designated Apparatus"**

7           Motorola next asserts that Fujifilm has failed to produce sufficient evidence of the

8    "designated apparatus" limitation in claim 13.  Mot. 29-31.  The relevant claim element states:

9           a second wireless communication device coupled to said second transmitting and
10          receiving circuit for transmitting the data to a **designated apparatus** without a
             transmitting provider.

11   '119 patent 6:45-50.  Motorola contends that for an apparatus to be a "designated apparatus," the

12   telephone user must be able to "initiate or perform some form of designation of the apparatus."

13   Mot. 30.  Motorola notes that Haeberli indicated the same during his deposition:

14
15          Q:  What has to happen to meet [the designated apparatus] limitation of claim 13 in your
             view?

16          A:  There has to be a designation by the user somehow, someplace that says this is the
17           apparatus I want to communicate with.

18          Q:  So that designation by the user, it's got to be something other than a manual point and
             shoot designation, is that right?
19
20          [ . . . ]

21          A:  That's what I'm saying, yes.

22          Haeberli Depo. at 156.

23          Motorola asserts that Fujifilm has not produced evidence showing that the accused phones

24   allow the user to "designate" the "apparatus" in this way.  Mot. 30.  Haeberli's declaration lists

25   "Bluetooth/WLAN antenna" as the one aspect of the accused Motorola phones that meets the claim

26   element in which "designated apparatus" appears.  *See* Haeberli Decl. ¶ 49.  According to Dr. Bims,

27   however, the Bluetooth/WLAN antennae on the accused phones operate "without any user

28   interaction or designation."  Bims. Decl. ¶ 25.  Dr. Bims explains that the accused phones

do not designate the apparatus to which the received data is to be transmitted. A second device may request data from internet servers through the Accused Motorola Product acting as WiFi access point. In that instance, however, these data requests are automatically routed through an Accused Motorola Product without any user designation through a menu interface of the Accused Motorola Product. The Accused Motorola Products do not designate the data to be transmitted to the second device. Rather, the designation of, or request for, data is made by the second device.

Bims Decl. ¶ 27.

Fujifilm views the operation of the accused phones differently. Fujifilm points to Haeberli's declaration, in which he explains that the majority of the Motorola phones he reviewed

> include a "Mobile Hotspot" feature, which involves using the Motorola device as a conduit to provide an internet connection for other nearby devices with WiFi capability. Similarly, a subset of the Motorola devices that I reviewed each include a "Bluetooth Tether" feature, which involves using the Motorola device as a conduit to provide an internet connection for other nearby devices with Bluetooth capability.

> For example, a user may set up a local wireless network using one of these features and connect a laptop computer to the network, allowing the laptop computer to connect to the internet via the Motorola device. This allows the user to wirelessly access the internet on the laptop even if there is no anchored access point (such as a home or business WiFi network) available by utilizing the cellular data through the Motorola phone.

Haeberli Decl. ¶ 40-41. Fujifilm asserts that in this scenario, the laptop computer serves as the "designated apparatus" required by claim 13; the fact that the phone user does not affirmatively designate the laptop computer as such is irrelevant because claim 13 does not require affirmative designation by the user. Opp. 29-30.

Motorola's "designated apparatus" argument is not really an insufficient evidence argument – it is a claim construction argument. Motorola's position is that the "designated apparatus" limitation should be construed to mean something like, "apparatus that has been affirmatively designated by the telephone user." The problem with this argument is that the claim language does not support it. Nothing in the language claim 13 requires that the "designated apparatus" be affirmatively designated by the telephone user. *See* '119 patent 6:35-55. In this way, claim 13 differs from, for example, claims 1 and 35, both of which require "a designating

United States District Court
Northern District of California

1   device on said wireless telephone for designating the data for reception by the wireless telephone

2   and for selectively designating an apparatus to which the received data is to be transmitted." '119

3   patent 4:35-45.

4         Differences between claims "can be a useful guide in understanding the meaning of

5   particular claim terms." *Arlington Indus., Inc. v. Bridgeport Fittings, Inc.*, 632 F.3d 1246, 1254

6   (Fed. Cir. 2011); *see also, Curtiss-Wright Flow Control Corp. v. Velan, Inc.*, 438 F.3d 1374, 1381

7   (Fed. Cir. 2006) ("[C]laim differentiation takes on relevance in the context of a claim construction

8   that would render additional, or different, language in another independent claim superfluous.").

9   The differences between claim 13 and claims 1 and 35 strongly indicate that the plain and ordinary

10  meaning of "designated apparatus" is not as restricted as Motorola purports it to be.

11        Motorola does not seriously contend otherwise.  Except for Haeberli's deposition

12  testimony, Motorola offers no reason to read a user interaction requirement into "designated

13  apparatus." *See* Mot. 29-31; Reply 15-16.  Haeberli's deposition testimony standing alone does

14  not justify rewriting the claim in this way. *See Phillips*, 415 F.3d at 1318 ("[C]onclusory,

15  unsupported assertions by experts as to the definition of a claim term are not useful to a court.").

16  As Motorola has not shown that claim 13 necessarily requires that the "designated apparatus" be

17  affirmatively designated by the telephone user, whether the accused products meet this limitation

18  remains a triable question of fact.  Motorola is not entitled to summary judgment of

19  noninfringement of claim 13 of the '119 patent on this ground.

20       **F.**    **Willfulness**

21        Motorola argues that it is entitled to summary judgment on willfulness because it has

22  "presented the Court with serious, legitimate responses to every single charge of infringement

23  Fujifilm has made . . . Motorola's noninfringement positions are objectively reasonable.  That is all

24  that is required to defeat Fujifilm's charge of willfulness."  Mot. 35.

25        To prove willful infringement, "a patentee must show by clear and convincing evidence that

26  the infringer acted despite an objectively high likelihood that its actions constituted infringement of

27  a valid patent." *In re Seagate Tech., LLC,* 497 F.3d 1360, 1371 (Fed. Cir. 2007).  "If this threshold

28  objective standard is satisfied, the patentee must also demonstrate that this objectively defined risk .

United States District Court
Northern District of California

1    . . was either known or so obvious that it should have been known to the accused infringer." *Id.*  A

2    willful infringement determination thus "requires a two-pronged analysis entailing separate

3    objective and subjective inquiries." *Powell v. Home Depot U.S.A., Inc.*, 663 F.3d 1221, 1236 (Fed.

4    Cir. 2011).  The objective inquiry is question of law for the court, while the subjective inquiry is a

5    fact question for the jury. *Bard Peripheral Vascular, Inc. v. W.L. Gore & Associates, Inc.*, 682

6    F.3d 1003, 1007-08 (Fed. Cir. 2012).

7         "While the objective prong of the willful infringement inquiry must be met before the

8    subjective prong is addressed, . . . district courts have broad discretion to set the order of trial."

9    *Powell*, 663 F.3d at 1237 n.2.  District courts "may, if the circumstances require, reserve a ruling on

10   the objective prong of the willfulness inquiry until after the subjective prong has been addressed."

11   *Ultratec, Inc. v. Sorenson Commc'ns, Inc.*, No. 13-cv-00346, 2014 WL 4976596, at *3 (W.D. Wis.

12   Oct. 3, 2014); *see also, Apple, Inc. v. Samsung Electronics Co.*, 920 F. Supp. 2d 1079, 1107 (N.D.

13   Cal. 2013) (addressing objective prong of willful infringement determination after sending

14   subjective prong to jury); *Fujitsu Ltd. v. Belkin Int'l, Inc.*, No. 10-cv-03972-LHK, 2012 WL

15   4497966, at *39 (N.D. Cal. Sept. 28, 2012) (denying defendants' motion for summary judgment of

16   no willfulness where "it would be more appropriate to decide the [objective prong] of willfulness

17   with the benefit of the jury's factual findings" on defendants' invalidity defenses, and the

18   subjective inquiry could not be resolved on the present record).  I find this approach appropriate

19   here and decline to rule on the objective prong at this time.  Motorola's motion for summary

20   judgment of no willfulness is DENIED.

21   **III.    FUJIFILM'S MOTION TO STRIKE**

22        Fujifilm moves to strike portions of Dr. Bims's and Dr. Bovik's expert reports regarding

23   invalidity on the grounds that they: (i) "set forth a factually unsupported narrative;" (ii) include new

24   prior art combinations; (iii) contravene my order limiting Motorola's prior art references; and/or

25   (iv) include previously undisclosed motivations to combine.  I address each ground in turn.

26        **A.    Factually Unsupported Narrative**

27        Fujifilm asks that I strike paragraphs 146-166 of Dr. Bims's report on the ground that they

28   set forth an "improper" and "unreliable" history of the collaboration between Fujifilm and Nokia in

United States District Court
Northern District of California

44

1    1999 and 2000.  Mot. 4.  Fujifilm states that the paragraphs concern a matter – a business

2    relationship between Fujifilm and Nokia – on which Dr. Bims does not qualify as an expert and has

3    no personal knowledge.  Fujifilm also accuses Dr. Bims of making statements in this portion of his

4    report that are not supported by the record.[14]

5         Motorola responds that one of its invalidity theories in this case is that Nokia, not Fujifilm,

6    invented the subject matter underlying the asserted claims of the 119 patent.  Opp. 12-14.  Motorola

7    states that it has relied on "multiple sources" to reconstitute the narrative of Nokia's invention of

8    the subject matter, and that "Dr. Bims's expert testimony regarding the material provided by these

9    sources is proper, because much of the material is technical in nature and because it requires

10   showing that elements of the asserted claims were in Nokia's possession."  *Id.*  Motorola adds that

11   Dr. Bims's testimony regarding the Fujifilm-Nokia collaboration is appropriate because it "must be

12   understood against the backdrop of the technology being discussed."  Opp. 14.

13        Fujifilm's motion to strike paragraphs 146-166 of Dr. Bims's report is GRANTED.

14   Motorola has not shown that Dr. Bims's testimony regarding the Fujifilm-Nokia collaboration is

15   admissible under Federal Rule of Evidence 702: it will not assist the trier of fact to understand or

16   determine a fact in issue.  *See Cooper*, 510 F.3d at 942; *see also, Andrews v. Metro N. Commuter*

17   *R. Co.*, 882 F.2d 705, 708 (2d Cir. 1989) (expert testimony is not admissible under Rule 702 where

18   it is directed to "lay matters which a jury is capable of understanding and deciding without the

19   expert's help").

20        As Fujifilm correctly observes, paragraphs 146-166 are replete with observations and

21   inferences that jurors are perfectly capable of making for themselves without the assistance of Dr.

22

23   _____

     [14] For example, in paragraph 153 of his report, Dr. Bims states, "It is . . . apparent . . . that
24   [Fujifilm] had access to the details of Nokia's efforts to incorporate Bluetooth into Nokia's mobile
     phones."  Bims Report ¶ 153 (Dkt. No. 160-8).  Dr. Bims continues: "[T]here were subsequent in-
25   person meetings and written communications involving Nokia employees and Fujifilm
     employees . . . that reflect the exchange of confidential information in 1999."  *Id.*  Dr. Bims
26   admitted at his deposition that he could not identify any direct evidence of confidential information
     being shared being Nokia and Fujifilm.  *See* Bims Depo. 141-44.  In paragraph 154 of his report,
27   Dr. Bims states that "Nokia provided to Fujifilm a Bluetooth module termed the 'DSC,' which was
     integrated into the Fujifilm camera."  Bims Report ¶ 154.  The record indicates, and Motorola does
28   not dispute, that "DSC" is an acronym for "digital still camera," not a codename for a Bluetooth
     module.  *See, e.g.,* Snodgrass Decl. Exs. 15-17 (Dkt. Nos. 160-16, 160-17, 160-18).

United States District Court
Northern District of California

1   Bims's technical expertise.  For example, Motorola does not explain how Dr. Bims's technical

2   expertise will assist jurors in understanding or determining that

3           [t]he interactions between Nokia and Fujifilm . . . began in 1998 after Nokia had
            already begun development of a Bluetooth-enabled dual-radio cellular telephone.
4           Nokia initiated the conversation when Mr. Vanjoki visited a Fujifilm booth at the
            Photokina trade show in September 1998, which was an industry event held in
5           Cologne, Germany, where photography, digital cameras, . . . and imaging
            products were demonstrated to the public.
6
7           Present at the meeting were at least Mr. Vanjoki from Nokia, and Mr. Asai and
            Mr. Watanabe from Fujifilm, wherein Nokia expressed a desire to cooperate with
8           Fujfilm to develop Bluetooth connectivity between Fujifilm's digital cameras and
            Nokia's mobile phones.  Prior to this time and during this time, Fujifilm had not
9           done any research and development with respect to Bluetooth technology, and had
            not ever developed a cellular telephone.  When Fujifilm executed the cooperation
10          agreement with Nokia to work on this joint project, Fujifilm's business purpose
            was simply to sell Bluetooth-enabled digital cameras.
11

12  Bims Report ¶¶ 150-51 (internal citations omitted).

13          Where expert testimony "simply rehash[es] otherwise admissible evidence about which [the

14  expert] has no personal knowledge, such evidence – taken on its own – is inadmissible."  *Highland*

15  *Capital Mgmt., L.P. v. Schneider*, 379 F. Supp. 2d 461, 469 (S.D.N.Y. 2005).  Such evidence "is

16  properly presented through percipient witnesses and documentary evidence," not through expert

17  testimony.  *In re Rezulin Products Liab. Litig.*, 309 F. Supp. 2d 531, 551 (S.D.N.Y. 2004)

18  (excluding expert's narrative of events where expert's "glosses" on the narrative were "simple

19  inferences drawn from uncomplicated facts"); *see also, Johns v. Bayer Corp.*, No. 09-cv-01935,

20  2013 WL 1498965, at *28 (S.D. Cal. Apr. 10, 2013) (excluding expert report which offered

21  "nothing more than a factual narrative" of otherwise admissible evidence); *Taylor v. Evans*, No. 94-

22  cv-08425, 1997 WL 154010, at *2 (S.D.N.Y. Apr. 1, 1997) (excluding portions of expert report

23  which "present[ed] a narrative of the case which a lay juror is equally capable of constructing").

24  Dr. Bims's testimony regarding the Fujifilm-Nokia collaboration is not excused from this rule

25  merely because the collaboration involved matters "technical in nature."  Opp. 12-14.  Despite the

26  technological backdrop of the interactions between Fujifilm and Nokia, Motorola has not

27  demonstrated that Dr. Bims's testimony on this subject will provide more than "simple inferences

28  drawn from uncomplicated facts," *Rezulin*, 309 F. Supp. 2d at 551, and a factual narrative which "a

United States District Court
Northern District of California

United States District Court
Northern District of California

1    lay juror is equally capable of constructing," *Taylor*, 1997 WL 154010, at *2.  Accordingly, that

2    testimony is not admissible at trial and is properly struck from Dr. Bims's report.

3    **B.**    **New Prior Art Combinations**

4    Fujifilm moves to strike portions of Dr. Bims's report on the ground that they introduce

5    new prior art combinations in violation of the Patent Local Rules.[15]  Mot. 8-9.

6    Dr. Bims opines in his report that the following combinations render claims 1 and 35 of

7    patent 119 obvious: (i) U.S. Patent No. 6,014,569 to Bottum ("Bottum") and U.S. Patent No.

8    7,257,426 to Witkowski et al. ("Witkowski"); (2) Bottum and U.S. Patent No. 6,714,530 to

9    Haartsen et al. ("Haartsen"); and (3) Bottum and Haartsen et al., Bluetooth: Vision, Goals, and

10   Architecture, Mobile Computing and Communications Reporter (Oct. 1998) ("Bluetooth

11   Vision").  *See* Snodgrass Decl., Ex. 18 (Dkt. No. 160-19).  Motorola did not specifically

12   identify any of these combinations in its invalidity contentions.  *See* Dkt. No. 96-1.

13   Motorola argues that while it did not specifically identify these combinations, it did

14   adequately disclose them.  Its supplemental invalidity contentions identify as an invalidating

15   combination for claims 1 and 35, "**Bottum** and Hollenberg in view of any one, two, or three of

16   Sulavouri, **Witkowski**, Kleinschmidt, Nokia 9000i, **Haartsen**, **Bluetooth Vision**."  Dkt. No. 96-1

17   (emphasis added).  Motorola then dropped the Hollenberg, Sulavouri, Kleinschmidt, and Nokia

18   9000i references in its February 14, 2014 Reduction of Prior Art References (the "Reduction"),

19   which eliminated all but 19 of the references asserted by Motorola in this action.  *See* Snodgrass

20   Decl. Ex. 5 (Dkt. No. 160-6).  Motorola contends that because it disclosed the combinations of

21   "Bottum and Hollenberg" with Witkowski, Haartsen, and Bluetooth Vision, it effectively disclosed

22   the combinations of Bottum and Witkowski, Bottum and Haartsen, and Bottum and Bluetooth

23   Vision.  Fujifilm takes issue with this proposition, arguing that "[i]n an obviousness analysis, the

24   combination A + B + C is not at all the same as combination A + C."  Reply 3.  Fujifilm contends

25   that Dr. Bims's opinion that Bottum alone combined with either Witkowski, Haartsen or Bluetooth

26   Vision renders claims 1 and 35 obvious reflects a new position that Bottum discloses much more

27

28   _____

[15] The portions are Exhibit 16 to Dr. Bims's report "to the extent that it discusses" the three prior art combinations discussed below.  *See* Mot. 1.

than Motorola previously indicated.

Under Patent Local Rule 3-3(b), an accused infringer alleging obviousness must include in its invalidity contentions "any combinations of prior art showing obviousness." Patent L.R. 3-3(b). Courts in this district have held that Rule 3-3(b) does not always require the accused infringer to spell out in exact detail every particular combination it intends to assert. For example, in *Avago Technologies Gen. IP PTE Ltd. v. Elan Microelectronics Corp.*, No. 04-cv-05385-HRL, 2007 WL 951818, at *4 (N.D. Cal. Mar. 28, 2007), the court found that the defendant had adequately disclosed its prior art combinations through lists such as

> Lyon I, Lyon II, Tanner I, Tanner II, Tanner III, Jackson, Williams, Zalenski, Nestler, Victor, Adan, Bishop, Arreguit and/or Shreier in combination with Allen I, Allen II, Stumpf, Morris, Ertel, Blalock, Little, Koch, Gottardi, Barron, Watkinson, Beauchemin, Szleiski, Barron, Yang and/or Chornoboy.

*Id.* at *4. The defendant claimed it had organized its prior art references into two groups and that the "theory of obviousness is the same for each and every possible combination of the two groups." *Id.* The court held that while this approach generated billions of possible combinations, it was sufficient under Rule 3-3(b) because it "reasonably specifies the combination of prior art references that allegedly render [the] patents obvious." *Id.*

The situation here is distinguishable from *Avago*. Motorola did not disclose a long list of references from which Fujifilm could ascertain – albeit with some difficulty – the particular combinations Motorola now seeks to assert. Rather, Motorola specifically stated that "Bottum and Hollenberg" (not Bottum alone) in combination with some or all of a series of other references rendered claims 1 and 35 obvious. By asserting only that "Bottum and Hollenberg" together could be used in these combinations to invalidate claims 1 and 35, Motorola effectively indicated that Bottum alone could not accomplish the same.

Nevertheless, I find that striking the Bottum combinations is not warranted. Motorola's supplemental invalidity contentions informed Fujifilm that Motorola intended to assert obviousness on the basis of combinations involving each of the three pairings that Fujifilm now moves to strike. The only difference is that the combinations also included Hollenberg. When Motorola served its Reduction dropping Hollenberg but not Bottum, it was reasonable to infer that Motorola intended

48

United States District Court
Northern District of California

1  to assert obviousness on the basis of the same previously disclosed combinations, just without

2  Hollenberg.  It is true that, following service of the Reduction, Motorola could have amended its

3  invalidity contentions and better specified the exact combinations it intended to assert.  But if

4  Motorola's failure to amend caused Fujifilm "to suffer any confusion as to what particular

5  obviousness combinations were being asserted, then the proper recourse would have been for

6  [Fujifilm] to compel [Motorola] to amend its invalidity contentions, not for [Fujifilm] to wait until

7  expert discovery and then move to strike the expert report." *Verinata Health,* 2014 WL 4100638,

8  at *6.  In these circumstances, striking the Bottum combinations would be a windfall to Fujifilm

9  and would be unfair to Motorola.  The motion to strike them is DENIED.

10  **C.      Order Limiting Prior Art References**

11          Fujifilm argues that Dr. Bims's report relies on far more prior art references than Motorola

12  is allowed to raise in this case.  Mot. 11-13.  On December 17, 2013, I issued an order limiting

13  Motorola to 20 references in total and no more than 6 per patent.  *See* Dkt. No. 72.  In line with this

14  order, on February 14, 2014, Motorola served its Reduction listing 19 references, 6 for the 427

15  patent, 4 for the 763 patent, 3 for the 285 and 886 patents, and 6 for the 119 patent.  *See* Snodgrass

16  Decl. Ex. 5 (Dkt. No. 160-6).  Fujifilm identifies dozens of portions of Dr. Bims's report that

17  discuss references which are not listed in the Reduction, and in certain instances where were not

18  disclosed in Motorola's invalidity contentions.  Fujifilm moves to strike all such portions.

19          Motorola concedes that Dr. Bims's report includes dozens of prior art references that are not

20  included in the Reduction and many of which were not previously disclosed at all.  Indeed,

21  Motorola submits a chart listing 70 such references, stating where each one appears in Dr. Bims's

22  report and explaining whether it is being used to show, for example, "background technology" or

23  "state of the art / knowledge of a person of ordinary skill in the art."  *See* Jones Decl. Ex. H (Dkt.

24  No. 177-2).  Motorola asserts that because the additional prior art references are being used for

25  these purposes and not as invalidating prior art per se, the references comply with my December

26  17, 2013 order and the patent local rules and should not be struck.

27          Motorola is correct that a number of courts in this district have declined to strike

28  undisclosed references when they are being used only as "background" material.  *See, e.g.,*

49

United States District Court
Northern District of California

1    *Verinata Health,* 2014 WL 4100638, at *5 (striking reference "from the expert report to the extent

2    that [the expert] relies on it as prior art that allegedly renders the asserted claims . . . obvious" but

3    allowing the expert to rely on the reference "as foundational or background material"); *Digital Reg*

4    *of Texas, LLC v. Adobe Sys., Inc.*, No. 12-cv-01971-CW, 2014 WL 4090550, at *9 (N.D. Cal. Aug.

5    19, 2014) (admitting certain references "to the extent that [they] are supporting documents to

6    explain further how the chosen prior art references disclose required limitations;" excluding certain

7    references "which disclose other required limitations not covered by the chosen prior art

8    references"); *ASUS Computer*, 2014 WL 1463609, at *8 (prohibiting use of reference "as an

9    anticipation or obviousness reference" but allowing expert to use it "for other purposes, e.g., to

10   show the knowledge of a PHOSITA"); *Genentech, Inc. v. Trustees of Univ. of Pennsylvania*, No.

11   10-cv-02037-PSG, 2012 WL 424985, at *3 (N.D. Cal. Feb. 9, 2012) ("The fact that a reference to a

12   particular clinical trial was not disclosed in the invalidity contentions does not render it unusable

13   for laying an historical foundation to research that was disclosed."); *but see Life Technologies*

14   *Corp. v. Biosearch Technologies, Inc.*, No. 12-cv-00852-WHA, 2012 WL 4097740, at *1-2 (N.D.

15   Cal. Sept. 17, 2012) (rejecting argument that references were admissible as background material;

16   stating that "courts have rejected such attempts to elude patent local rules by defining material as

17   'background' or 'context'").

18        I will follow the same approach here and allow Motorola to rely on the additional prior art

19   references as background material, but not as anticipation or obviousness references.  Fujifilm

20   contends that even if this approach applies to references not disclosed under the Patent Local Rules,

21   it should not apply to references in excess of the limits set by the December 17, 2013 order.  *See*

22   Reply 9-10.  I see no reason to distinguish between the two categories of additional prior art

23   references and will treat both categories the same.  Accordingly, Fujifilm's motion to strike prior

24   art references in Dr. Bims's report that were not listed in the Reduction and/or not disclosed in

25   Motorola's invalidity contentions is GRANTED to the extent those references are used as

26   anticipation and/or obviousness references.  However, to the extent those references are used

27   merely as background material, I will not impose a strict rule barring them at this time.

28        One other issue regarding the additional prior art references in Dr. Bims's report requires

1    discussion.  The parties dispute whether materials offered to show invalidity under 35 U.S.C. §

2    102(f) qualify as prior art references for the purposes of the Patent Local Rules and the December

3    17, 2013 order.  Patent Local Rule 3-3(a) provides that "[p]rior art under 35 U.S.C. § 102(f) shall

4    be identified by providing the name of the person(s) from whom and the circumstances under

5    which the invention or any part of it was derived."  Patent L.R. 3-3(a).  I read this rule to require

6    the disclosure of "the name of the person(s) from whom and the circumstances under which the

7    invention or any part of it was derived," not the disclosure of all materials the party intends to offer

8    to show invalidity under the statute.  Motorola disclosed in its invalidity contentions that "Nokia,

9    including engineers at Nokia" invented the 119 patent's claimed subject matter before or during the

10   Fujifilm-Nokia collaboration.  Dkt. No. 96 at 5.  This was sufficient to satisfy Rule 3-3(a).

11   In light of Rule 3-3(a)'s approach to prior art under Section 102(f), I will count the assertion

12   of invalidity under Section 102(f) as one reference for the purposes of the December 17, 2013

13   order.  I will not count each piece of evidence offered to show invalidity under the statute as a

14   separate reference.  Motorola lists six references in the Reduction for the '119 patent, none of

15   which correspond to invalidity under Section 102(f).  Under the December 17, 2013 order,

16   Motorola is limited to no more than six references per patent.  That limit shall remain in place.

17   Accordingly, Motorola must either forego reliance on its Section 102(f) defense or, alternatively,

18   substitute its Section 102(f) defense for one of the six references currently listed for the '119 patent

19   and forego reliance on the substituted reference.  If Motorola elects the latter option, Motorola shall

20   serve an amended Reduction of Prior Art References on or before February 27, 2015.

21   **D.    Previously Undisclosed Motivations to Combine**

22   Fujifilm asserts that Dr. Bims's report contains previously undisclosed explanations of why

23   a person of ordinary skill in the art would be motivated to combine certain prior art references.

24   Mot. 9-11.  Fujifilm identifies the same issue in Dr. Bovik's report.  Mot. 13-14.  Fujifilm moves to

25   strike these portions of the reports.[16]  Motorola concedes that the motivation to combine

26   explanations in Dr. Bims's and Dr. Bovik's reports are significantly different from those that were

27

28   _____
[16] The portions are ¶¶ 291-318, 320-323, 325-327, and 329-331 of Dr. Bims's report, and ¶¶ 152-156, 190, 215, 230, and Exs. C-J of Dr. Bovik's report.  Mot. 11, 14.

United States District Court
Northern District of California

previously disclosed.  *See* Dkt. No. 96 at 5-7; Bims Report ¶¶ 291-318; Bovik Report ¶¶ 152-56.

However, Motorola contends that the Patent Local Rules do not require the disclosure of

motivations to combine, so long as the accused infringer's invalidity contentions include otherwise

adequate explanations of why the relevant prior art references render the asserted claims obvious.

Opp. 7-8.

I agree with Motorola.  Under the prior version of Patent Local Rule 3-3(b), Motorola

would have been required to disclose any motivations to combine it intended to assert at trial.

The prior version stated that "[i]f a combination of items of prior art makes a claim obvious, each

such combination, and the motivation to combine such items, must be identified."  *O2 Micro*, 467

F.3d at 1359 n.4.  But Rule 3-3(b) was amended in 2008.  In contrast with the prior version of the

rule, the current version does not single out motivations to combine for disclosure.  The current

version provides instead that where obviousness is asserted, the invalidity contentions must contain

"an explanation of why the prior art renders the asserted claim obvious, including an identification

of any combinations of prior art showing obviousness."  Patent L.R. 3-3(b).  While this language

requires the disclosure of some explanation of obviousness, it does not require that the explanation

include motivations to combine.  Fujifilm does not dispute that, with the exception of failing to

disclose certain motivations to combine, Motorola provided adequate explanations of obviousness

in its invalidity contentions.

Fujifilm argues that the current version of Rule 3-3(b) still requires the disclosure of

motivations to combine because the rule was amended in response to *KSR Int'l Co. v. Teleflex Inc.*,

550 U.S. 398 (2007).  In *KSR*, the Supreme Court identified several problems with the Federal

Circuit's rigid application of the "teaching, suggestion, motivation" test and "set forth an expansive

and flexible approach" to assessing obviousness.  *Id.* at 415-418.  *KSR* did not hold, however, that

motivations to combine are wholly irrelevant  to the obviousness inquiry.  *See id.* at 418 (noting

that "it can be important to identify a reason that would have prompted a person of ordinary skill in

the relevant field to combine the elements in the way the claimed . . . invention does").  The

Federal Circuit continues to look to motivations to combine when considering whether

combinations of references render a claimed invention obvious.  *See, e.g., Allergan, Inc. v. Sandoz*

52

*Inc.*, 726 F.3d 1286, 1291-92 (Fed. Cir. 2013); *Kinetic Concepts, Inc. v. Smith & Nephew, Inc.*, 688 F.3d 1342, 1368-69 (Fed. Cir. 2012); *Wyers v. Master Lock Co.*, 616 F.3d 1231, 1238-45 (Fed. Cir. 2010). So do courts in this district. *See, e.g., Nalco Co. v. Turner Designs, Inc.*, No. 13-cv-02727-NC, 2014 WL 5335736, at *12 (N.D. Cal. Oct. 17, 2014); *Apple, Inc. v. Samsung Electronics Co.*, No. 12-cv-00630-LHK, 2014 WL 4467837, at *9 (N.D. Cal. Sept. 9, 2014); *MediaTek, Inc. v. Freescale Semiconductor, Inc.*, No. 11-cv-05341-YGR, 2014 WL 2854705, at *1-2 (N.D. Cal. June 20, 2014). Fujifilm argues that because motivations to combine remain relevant to determining obviousness, an accused infringer must disclose them as part of its explanation of obviousness under Rule 3-3(b), or else forfeit them at trial.

The problem with this argument is that the patent local rules do not mandate the disclosure of all evidence relevant to an accused infringer's invalidity theories. The rules are designed "to require parties to crystallize their theories of the case early in the litigation and to adhere to those theories once they have been disclosed." *Nova*, 417 F. Supp. 2d at 1123; *see also, O2 Micro*, 467 F.3d at 1365-66 ("The rules thus seek to balance the right to develop new information in discovery with the need for certainty as to the legal theories."). They are not designed to force parties to produce, far in advance of trial, all evidence they intend to offer in support of their legal theories. *See, e.g., Golden Bridge*, 2014 WL 1928977, at *3. Accordingly, as noted above, courts in this district have allowed the use of prior art references as "background" material, even when not previously disclosed in the accused infringer's invalidity contentions. That motivations to combine remain relevant to the obviousness inquiry is thus not dispositive to whether they must be struck from expert reports when not properly disclosed in invalidity contentions. Rather, the relevant question is the usual one: "whether the expert has permissibly specified the application of a disclosed theory or impermissibly substituted a new theory altogether." *Digital Reg of Texas, LLC v. Adobe Sys. Inc.*, No. 12-cv-01971-KAW, 2014 WL 1653131, at *2 (N.D. Cal. Apr. 24, 2014); *Apple Inc. v. Samsung Electronics Co.*, No. 12-cv-00630-PSG, 2014 WL 173409, at *1 (N.D. Cal. Jan. 9, 2014). Fujifilm does not argue, much less show, that the undisclosed motivations to combine it seeks to strike constitute new invalidity theories, as opposed to more specific articulations of previously disclosed ones. Accordingly, the motion to strike these portions of the

United States District Court
Northern District of California

1    expert reports is DENIED.

2    **IV.   ADMINISTRATIVE MOTIONS TO FILE UNDER SEAL**

3         The parties filed a number of administrative motions to file under seal in conjunction with

4    these motions.  A party seeking to seal material related to dispositive motions must "articulate

5    compelling reasons supported by specific factual findings," identifying the particular interests

6    favoring secrecy and showing how those interests outweigh the "strong presumption" favoring

7    disclosure.  *Kamakana v. City & Cnty. of Honolulu,* 447 F.3d 1172, 1178-81 (9th Cir. 2006).  In

8    general, compelling reasons sufficient to justify sealing exist when the materials may "become a

9    vehicle for improper purposes, such as . . . to gratify private spite, promote public scandal, . . . or

10   release trade secrets."  *Id.* at 1179.  "The mere fact that the production of records may lead to a

11   litigant's embarrassment, incrimination, or exposure to further litigation will not, without more,

12   compel the court to seal its records."  *Id.*

13        Motorola seeks sealing of certain portions of Exhibits 1-3 attached to the Jones Declaration

14   submitted in support of Motorola's summary judgment motion.  Dkt. No. 155-1.  The asserted

15   ground for sealing is that the portions reflect material that has been designated confidential by (or

16   on behalf of) third parties Nvidia, Aptina, Hewlett Packard, Qualcomm, and Texas Instruments.  As

17   required by Civil Local Rule 79-5(e)(1), Nvidia submitted a declaration establishing that the

18   portions sought to be sealed on its behalf are sealable.  *See* Dkt. No. 158.  Aptina, Hewlett Packard,

19   Qualcomm, and Texas Instruments did not submit declarations.  Accordingly, Motorola's

20   December 9, 2014 sealing motion, Dkt. No. 155, is GRANTED IN PART and DENIED IN PART.

21   It is GRANTED with respect to those portions sought to be sealed on behalf of Nvidia, except for

22   Exhibit 2, Page 52, lines 9-12.  Those portions are: (1) Exhibit 1: lines 202:13-15, 19-25.  (2)

23   Exhibit 2: Page 35, lines 5-28; Page 36; Page 37, lines 1-2; Page 51, lines 8-28; Page 52, lines 1-16

24   (except for lines 9-12); Page 87, lines 1-2 and 16-26.  The motion is DENIED with respect to all

25   other portions sought to be sealed.

26        Fujifilm seeks sealing of certain portions of Dr. Bims's report, which Fujifilm submits in

27   conjunction with its motion to strike.  Dkt. No. 159.  The report is Exhibit 7 to the Snodgrass

28   Declaration submitted in support of the motion to strike.  Dkt. No. 160-7.  The asserted ground for

United States District Court
Northern District of California

United States District Court
Northern District of California

1    sealing is that the portions reflect material that has been designated as confidential by third parties

2    Intel, Microsoft, Ericcson, and Nokia.  On December 22, 2014, Fujifilm notified the Court that the

3    portions identified for sealing on behalf of Intel and Microsoft did not need to be sealed.  Dkt. No.

4    165.  Neither Ericcson nor Nokia filed declarations as required by Civil Local Rule 79-5(e).

5    Accordingly, Fujifilm's December 17, 2014 sealing motion, Dkt. No. 159, is DENIED.

6           Fujifilm seeks sealing of certain portions of its opposition brief to Motorola's summary

7    judgment motion.  Dkt. No. 166.  Fujifilm also seeks sealing of certain portions of various exhibits

8    attached to the Snodgrass Declaration submitted in support of the opposition brief.  *Id.*  The

9    asserted ground for sealing is that the portions reflect material designated as confidential by third

10   parties Hewlett Packard, OmniVision, NVIDIA, Qualcomm, Texas Instruments, and also by

11   Motorola.

12          Hewlett Packard did not file a declaration.  OmniVision notified the Court that no

13   documents need to be sealed on its behalf.  *See* Dkt. Nos. 170, 185.  NVIDIA, Qualcomm, Texas

14   Instruments, and Motorola each submitted a declaration establishing that certain portions of the

15   documents sought to be sealed are in fact sealable.  Accordingly, Fujifilm's December 23, 2014

16   sealing motion, Dkt. No. 166, is GRANTED IN PART and DENIED IN PART.  It is GRANTED

17   with respect to those portions discussed in the declarations submitted by NVIDIA, Qualcomm,

18   Texas Instruments, and Motorola, except for the following portions of Dr. Castleman's declaration:

19   page 25, lines 6-7; page 27, lines 21-22; page 29, lines 1-4; and page 30, lines 6-10.  *See* Dkt. Nos.

20   171-74.  With respect to all other portions sought to be sealed, the motion is DENIED.

                                     **CONCLUSION**

21   For the foregoing reasons:

22

23          •    Motorola's motion for summary judgment is GRANTED IN PART and DENIED
                 IN PART.  Dkt. No. 153.
24

25          •    Fujifilm's motion to strike is GRANTED IN PART AND DENIED IN PART.  Dkt.
                 No. 160.

26          •    Motorola's December 9, 2014 sealing motion is GRANTED IN PART and
                 DENIED IN PART.  Dkt. No. 155.
27

28          •    Fujifilm's December 17, 2014 sealing motion is DENIED.  Dkt. No. 159.

- • Fujifilm's December 23, 2014 sealing motion is GRANTED IN PART and DENIED IN PART.  Dkt. No. 166.

**IT IS SO ORDERED**.

Dated: February 20, 2015



WILLIAM H. ORRICK
United States District Judge

United States District Court
Northern District of California