1

2

3

4                                    UNITED STATES DISTRICT COURT

5                                   NORTHERN DISTRICT OF CALIFORNIA

6

7    FUJIFILM CORPORATION,                        Case No. 12-cv-03587-WHO

           Plaintiff,
8                                                 **ORDER ON DEFENDANT'S MOTION
                                                  TO EXCLUDE TESTIMONY OF KEITH
9          v.                                     PARDY AND DR. GARETH
                                                  MACARTNEY; PLAINTIFF'S AND
10   MOTOROLA MOBILITY LLC,                        DEFENDANT'S OUTSTANDING
                                                  MOTIONS IN LIMINE**
           Defendant.
11
                                                  Re: Dkt. Nos. 198, 202, 237, 250
12
                                        **INTRODUCTION**
13
              This is a patent infringement action.  Plaintiff Fujifilm Corporation ("Fujifilm") accuses
14
     defendant Motorola Mobility LLC ("Motorola") of infringing claims 1, 2, 7, and 11 of U.S. Patent
15
     No. 6,144,763 (the '763 patent); claim 1 of U.S. Patent No. 8,306,285 (the '285 patent); claim 11
16
     of U.S. Patent No. 7,327,886 (the '886 patent); and claims 1, 13, and 35 of U.S. Patent No.
17
     6,915,119 (the '119 patent).  Each of the patents in suit concerns technology used in digital
18
     cameras and/or cellular telephones.  Trial is set for April 20, 2015.
19
              Motorola moves to exclude the testimony of Fujifilm's damages experts, Keith Pardy and
20
     Dr. Gareth Macartney.  Because most of Motorola's arguments go to the weight of this testimony
21
     rather than its admissibility, the motion to exclude Pardy's testimony is DENIED, and the motion
22
     to exclude Dr. Macartney's testimony is GRANTED IN PART and DENIED IN PART.
23
              This order also resolves the parties' two outstanding motions in limine, Fujifilm's motion
24
     in limine no. 4 and Motorola's motion in limine no. 5.  Fujifilm's motion no. 4 is GRANTED IN
25
     PART and DENIED IN PART.  Motorola's motion no. 5 is GRANTED.
26

27

28

United States District Court
Northern District of California

1

**LEGAL STANDARD**

2

**I.      FEDERAL RULE OF EVIDENCE 702**

3

Federal Rule of Evidence 702 allows a qualified expert to testify "in the form of an opinion

4

or otherwise" where:

5

(a) the expert's scientific, technical, or other specialized knowledge
will help the trier of fact to understand the evidence or to determine

6

a fact in issue;

7

(b) the testimony is based on sufficient facts or data;

8

(c) the testimony is the product of reliable principles and methods;
and

9

10

(d) the expert has reliably applied the principles and methods to the
facts of the case.

11

Fed. R. Evid. 702.

12

Expert testimony is admissible under Rule 702 if it is both relevant and reliable.  *See*

13

*Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589 (1993).  "[R]elevance means that the

14

evidence will assist the trier of fact to understand or determine a fact in issue."  *Cooper v. Brown*,

15

510 F.3d 870, 942 (9th Cir. 2007); *see also Primiano v. Cook*, 598 F.3d 558, 564 (9th Cir. 2010)

16

("The requirement that the opinion testimony assist the trier of fact goes primarily to relevance.")

17

(internal quotation marks omitted).

18

Under the reliability requirement, the expert testimony must "ha[ve] a reliable basis in the

19

knowledge and experience of the relevant discipline."  *Primiano*, 598 F.3d at 565.  To ensure

20

reliability, the court must "assess the [expert's] reasoning or methodology, using as appropriate

21

such criteria as testability, publication in peer reviewed literature, and general acceptance."  *Id.*

22

These factors are "helpful, not definitive," and a court has discretion to decide how to test

23

reliability "based on the particular circumstances of the particular case."  *Id.* (internal quotation

24

marks and footnotes omitted).  "When evaluating specialized or technical expert opinion

25

testimony, the relevant reliability concerns may focus upon personal knowledge or experience."

26

*United States v. Sandoval-Mendoza*, 472 F.3d 645, 655 (9th Cir. 2006).

27

The inquiry into the admissibility of expert testimony is "a flexible one" where "[s]haky

28

but admissible evidence is to be attacked by cross examination, contrary evidence, and attention to

United States District Court
Northern District of California

2

the burden of proof, not exclusion." *Primiano*, 598 F.3d at 564. "When the methodology is sound, and the evidence relied upon sufficiently related to the case at hand, disputes about the degree of relevance or accuracy (above this minimum threshold) may go to the testimony's weight, but not its admissibility." *i4i Ltd. P'ship v. Microsoft Corp.*, 598 F.3d 831, 852 (Fed. Cir. 2010). The burden is on the proponent of the expert testimony to show, by a preponderance of the evidence, that the admissibility requirements are satisfied. *Lust By & Through Lust v. Merrell Dow Pharm., Inc.*, 89 F.3d 594, 598 (9th Cir. 1996); *see also* Fed. R. Evid. 702 advisory committee's note.

## II.      REASONABLE ROYALTY DETERMINATION

A patentee who prevails in an infringement action is entitled to "damages adequate to compensate for the infringement, but in no event less than a reasonable royalty for the use made of the invention by the infringer." 35 U.S.C. § 284. Where an established royalty does not exist, a court may determine a reasonable royalty based on a hypothetical negotiation between the parties. *Applied Med. Res. Corp. v. U.S. Surgical Corp.,* 435 F.3d 1356, 1361 (Fed. Cir. 2006). The hypothetical negotiation is a legal construct that "attempts to ascertain the royalty upon which the parties would have agreed had they successfully negotiated an agreement just before infringement began." *Lucent Technologies, Inc. v. Gateway, Inc.,* 580 F.3d 1301, 1324 (Fed. Cir. 2009). In other words, the "basic question" answered by a hypothetical negotiation is: "if, on the eve of infringement, a willing licensor and licensee had entered into an agreement instead of allowing infringement of the patent to take place, what would that agreement be?" *LaserDynamics, Inc. v. Quanta Computer, Inc.,* 694 F.3d 51, 76 (Fed. Cir. 2012). While this analysis "requires sound economic and factual predicates," *Riles v. Shell Exploration & Prod. Co.*, 298 F.3d 1302, 1311 (Fed. Cir. 2002), it also "necessarily involves an element of approximation and uncertainty," *Interactive Pictures Corp. v. Infinite Pictures, Inc.*, 274 F.3d 1371, 1385 (Fed. Cir. 2001).

In determining a reasonable royalty, experts often consider one or more of a nonexhaustive list of fifteen factors set forth in *Georgia-Pacific Corp. v. U.S. Plywood Corp.*, 318 F. Supp. 1116, 1120 (S.D.N.Y. 1970). The Federal Circuit "do[es] not require that witnesses use any or all of the *Georgia-Pacific* factors when testifying about damages in patent cases." *Whitserve, LLC v.*

United States District Court
Northern District of California

*Computer Packages, Inc.*, 694 F.3d 10, 31 (Fed. Cir. 2012).  However, when one or more factors are used, "some explanation of both why and generally to what extent the particular factor impacts the royalty calculation is needed."  *Id.*

**DISCUSSION**

**I.      MOTION TO EXCLUDE TESTIMONY OF KEITH PARDY**

Keith Pardy is a marketing executive with twenty-five years of "marketing experience involving mobile technology and fast moving consumer goods."  Pardy Rpt. ¶ 6 (Giardina Decl. Ex. A, Dkt. No. 198-6).  He worked for Coca-Cola for seventeen years before joining Nokia Corporation in 2004 as Senior Vice President of Strategic Marketing.  *Id.* at ¶ 10.  In 2009, he joined BlackBerry (then called Research in Motion) as its Chief Marketing Officer and an Executive Board Member.  *Id.* at ¶ 11.

Motorola contends that each of the four "main" opinions offered by Pardy should be excluded, along with the "multiple subsidiary opinions" on which each main opinion depends. Mot. 3.  The four main opinions are: (1) that there was a "deliberate strategy" by smartphone manufacturers to "converge" on the standalone digital camera market; (2) that Motorola relied on various camera features embodying the asserted claims of the '285, '886 and '763 patents (the "camera patents") to increase the sales volume and profits of its smartphones; (3) that Motorola relied on hotspot and wireless data transfer features embodying the asserted claims of the '119 patent to increase the sales volume and profits of its smartphones; and (4) that various features embodying the patents in suit "contributed in a meaningful way to make smartphone cameras 'good enough' to replace digital still cameras for many consumers," and "helped allow Motorola to successfully compete in the United States smartphone market."  Pardy Rpt. ¶¶ 4-5.  I address each of these main opinions in turn.

**A.      Pardy's opinion that there was a "deliberate strategy" by smartphone manufacturers to "converge" on the standalone digital camera market**

Motorola contends this opinion is inadmissible under Rule 702 because it will not help the trier of fact to understand the evidence or to determine a fact in issue.  Mot. 6-8.  Motorola argues there is "no reason a lay juror cannot assess the available evidence and draw his or her own

United States District Court<br>Northern District of California

conclusion" as to whether smartphone manufacturers targeted the standalone digital camera market. *Id.* Motorola further argues that the opinion should be excluded because Pardy "cites no empirical data" to support it, and because it is not relevant to any fact of consequence in this case. Mot. 7-8. Motorola states: "There is no issue before the jury regarding any alleged 'strategy' by smartphone manufacturers . . . to 'converge' upon the . . . digital camera market." Mot. 8.

Fujifilm responds that Pardy's opinion is not one of a layperson, but "one of a seasoned marketing veteran who thoroughly reviewed smartphone market data, industry reports, [and] contemporaneous accounts of consumer behavior and preferences" in reaching his conclusions. Opp. 3-4. Fujifilm further contends that there is no requirement that expert testimony be supported by empirical data, and that Pardy's opinion shows how infringement of the asserted claims contributed to the shift of consumer demand from standalone digital cameras to smartphones. Opp. 6. Fujifilm asserts that Pardy's opinion is thus relevant to establish the value of the asserted claims and, hence, the amount that Motorola hypothetically would have been willing to pay to license them. Opp. 6.

Motorola's motion to exclude this opinion is DENIED. While the opinion is neither scientific nor technical, it is sufficiently specialized to merit admission under Rule 702. It is also sufficiently supported by factual information. The various materials that Pardy identifies in support of his opinion distinguish this case from *Samuels v. Holland Am. Line-USA Inc.*, 656 F.3d 948 (9th Cir. 2011), on which Motorola relies, Mot. 7. In that case, the Ninth Circuit affirmed the exclusion of expert testimony "to the effect that entering the water [at a particular beach] is extremely dangerous and that this danger is commonly known throughout the cruise line industry." 656 F.3d at 952. The court explained that one of the experts "was unable to provide any materials from the cruise line industry to support [his opinion]," and that the expert's research consisted of "little more than a quick internet search regarding [the beach] and a few telephone calls." *Id.* at 952-53. The other expert had never worked for a cruise line and "failed to specify in her declaration what information she relied on in reaching her conclusions." *Id.* at 953. Here, in contrast, Pardy has specifically identified various materials in support his opinion and has worked for the smartphone industry. *See, e.g.,* Pardy Rpt. ¶¶ 25-44. Motorola's contention that Pardy

5

United States District Court
Northern District of California

"cites no empirical data" in support of the opinion is not persuasive given that there is no per se requirement that all expert testimony be supported by empirical data.  *See, e.g., Primiano*, 598 F.3d at 565 (expert testimony must "ha[ve] a reliable basis in the knowledge and experience of the relevant discipline"); *Sandoval-Mendoza*, 472 F.3d at 655 ("When evaluating specialized or technical expert opinion testimony, the relevant reliability concerns may focus upon personal knowledge or experience.") (internal quotation marks omitted); *see also* Fed. R. Evid. 702(b) (expert testimony must be based on "sufficient facts *or* data") (emphasis added).

I also agree with Fujifilm that Pardy's testimony regarding the shift of consumer demand from standalone digital cameras to smartphones, and the efforts of smartphone manufacturers to bring about that shift, is relevant to damages.  *See Georgia-Pacific*, 318 F. Supp. at 1120 (factors relevant to determination of reasonably royalty include "[t]he commercial relationship between the licensor and licensee").  But there is potential for Motorola to be unfairly prejudiced  by testimony suggesting that smartphone manufacturers acted with nefarious or otherwise "bad" intent in attempting to increase consumer demand for their products.  Accordingly, Fujifilm should ensure that Pardy's testimony on this subject remains closely linked to damages issues, and avoids suggestions of improper intent on the part of Motorola or other smartphone manufacturers.

**B.    Pardy's opinion that Motorola relied on various camera features embodying the asserted claims of the camera patents to increase the sales volume and profits of its smartphones**

Motorola offers three arguments for excluding this opinion.  None is persuasive, and the opinion will not be excluded at this time.

Motorola first contends the opinion is unreliable because Pardy admits he has no personal knowledge of whether the camera features at issue actually embody the asserted claims of the camera patents.  Mot. 8.  Pardy states in his report that "it is [his] understanding that Fujifilm had at least [five] proprietary camera and communications features that were incorporated into Motorola smartphones."  Pardy Rpt. ¶ 45.  The features are (i) "face detection;" (ii) "live viewfinder with thinning technology;" (iii) "monochrome technology;" (iv) "hotspot technology;" and (v) "wireless transfer technology."  *Id.*  Pardy admits, however, that his understanding of these

features is based exclusively on conversations he had with Fujifilm's technical experts, and that he has never seen or read the patents in suit.  *See* Pardy Rpt. ¶ 45; Pardy Dep. 99-100, 141 (Giardina Decl. Ex. F, Dkt. No. 199-1).  Motorola argues this lack of personal knowledge renders the opinion inadmissible.  Mot. 8.

Pardy's testimony regarding the "live viewfinder with thinning technology" is properly excluded because that feature corresponds to the '427 patent, which is no longer at issue in this case.  But Pardy's testimony regarding the other four camera features is admissible.  Pardy will be opining not on whether the accused products infringe, but on the value of the asserted claims.  It is acceptable for Pardy to rely on Fujifilm's technical experts in reaching that opinion.  *See MediaTek inc. v. Freescale Semiconductor, Inc.*, No. 11-cv-05341-YGR, 2014 WL 971765, at *1-2 (N.D. Cal. Mar. 5, 2014) (experts "need not be experts in all fields" or "have personal knowledge of the factual background in the case"); *DataQuill Ltd. v. High Tech Computer Corp.*, 887 F. Supp. 2d 999, 1026 (S.D. Cal. 2011) ("It is routine and proper for a damages expert in a technical patent case to rely on a technical expert for background."); *United States v. 1,014.16 Acres of Land, More or Less, Situate in Vernon Cnty., State of Mo.*, 558 F. Supp. 1238, 1242 (W.D. Mo. 1983) ("An expert cannot be an expert in all fields, and it is reasonable to expect that experts will rely on the opinion of experts in other fields as background material for arriving at an opinion.").  Motorola cites no authority to the contrary.  At trial, Motorola will have the opportunity to cross examine Pardy on the factual basis and assumptions for his opinion, and Fujifilm's technical experts on whether the camera features at issue in fact embody the asserted claims of the camera patents.  If the factual basis or assumptions for Pardy's opinion "are found to be inaccurate or ill-founded, then the jury may afford the opinion less weight, if any." *MediaTek*, 2014 WL 971765, at *2.  However, Pardy's lack of personal knowledge of the relationship between the particular camera features and the asserted claims is not grounds for excluding his testimony.

Motorola's second argument focuses on the following excerpt from Pardy's report:

> In my opinion, Motorola would not have been as successful at selling the Droid X and its other smartphones if those phones did not have a 'good enough' camera that allowed users to take high quality

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

> images. Indeed, Motorola itself recognized that the camera was a top priority in its phones. As explained above, the Face Detection Technology, Live Viewfinder, and Monochrome Filter were all important features and each contributed meaningfully to creating a 'good enough' camera that allowed users to easily take high quality photos and even cause consumers to forgo the purchase of a separate digital camera.

Mot. 8-9 (quoting Pardy Rpt. ¶ 71). Motorola contends that this testimony is not reliable because Pardy cites no empirical data in support of it. However, as stated above, empirical data is not always necessary to establish the reliability of expert testimony. *See, e.g., Primiano*, 598 F.3d at 565; *Sandoval-Mendoza*, 472 F.3d at 655. Moreover, Pardy does cite empirical data in support of this testimony – specifically, empirical data gleaned from consumer studies conducted by Motorola in 2009 and 2011. *See, e.g.,* Pardy Rpt. ¶¶ 39, 50.

Finally, Motorola attacks one of the Motorola consumer studies that Pardy cites. The study is dated October 2011 and titled "Imaging Feature Study: Camera Usage & Attitudes." Giardina Ex. B at 1 (Dkt. No. 198-8); Pardy Rpt. ¶ 50. Motorola identifies two flaws in the Imaging Feature Study: (i) that survey respondents "were not drawn from the pool of all smartphone users" but rather were "mid/high tier smartphone owners" with "above average interest in the [camera] features," thereby "grossly" distorting the survey results; and (ii) that the camera features the survey presented to consumers "do not correlate to any specific [patent in suit]." Mot. 9-11.

Experts regularly base their opinions on survey data. The Ninth Circuit recognizes that "as long as [the survey is] conducted according to accepted principles, survey evidence should ordinarily be found sufficiently reliable under *Daubert*. Unlike novel scientific theories, a jury should be able to determine whether asserted technical deficiencies undermine a survey's probative value." *Southland Sod Farms v. Stover Seed Co.*, 108 F.3d 1134, 1143 n.8 (9th Cir. 1997) (internal quotation marks and citations omitted); *see also Clicks Billiards, Inc. v. Sixshooters, Inc.*, 251 F.3d 1252, 1262 (9th Cir. 2001) ("Technical unreliability goes to the weight accorded a survey, not its admissibility."). "Treatment of surveys is a two-step process. First, is the survey admissible? That is, is there a proper foundation for admissibility, and is it relevant and conducted according to accepted principles? This threshold question may be determined by the judge. Once the survey is admitted, however, follow-on issues of methodology, survey design, . . .

1    the experience and reputation of the expert, critique of conclusions, and the like go to the weight of

2    the survey rather than its admissibility." *Clicks*, 251 F.3d at 1263 (internal citations omitted).

3           In line with these principles, courts in this district have recognized that the framing of

4    survey questions "is generally an issue of weight, not admissibility." *Apple*, 2014 WL 794328, at

5    *18; *accord Sentius Int'l, LLC v. Microsoft Corp.*, No. 13-cv-00825-PSG, 2015 WL 331939, at *3

6    (N.D. Cal. Jan. 23, 2015).  However, "there must be outer limits to this principle." *Apple*, 2014

7    WL 794328, at *18.  "At some point, a description of a patent in a survey may vary so much from

8    what is claimed that the survey no longer relates to any issue in the case . . . Such survey evidence

9    would not help the trier of fact and therefore must be excluded under Rule 702(a)." *Id.* (internal

10   quotation marks and modifications omitted).  In addition, "discrepancies between the scope of the

11   patent claims and the survey questions may be so confusing to the jury as to substantially outweigh

12   the survey's probative value, thus requiring the Court to exclude such material under Rule 403."

13   *Id.*  "The precise line between when a survey question's description of patented technology is

14   'close enough' to the asserted claim as to be an issue of weight and when a survey question so

15   departs from the asserted claim as to be excluded under Rules 702 and 403 has not been defined."

16   *Id.*

17          That the Imaging Feature Study questioned only "mid/high tier smartphone owners" does

18   not justify excluding Pardy's testimony.  The Imaging Feature Study defines "mid/high tier

19   smartphone owners" as "monthly photo takers."  Giardina Decl. Ex. B at 2.  The "Research

20   Methodology" section of the study further explains that 1,003 people between ages 16 and 54 were

21   surveyed, each of whom "take[s] [a photo] at least once a month," and at least half of whom

22   "intend to spend $199+ on their next smartphone."  Carr Decl. Ex. 2 at 42 (Dkt. No. 237-6).  This

23   population does not appear so unique as to "grossly" distort the survey results and to render the

24   survey either irrelevant or inconsistent with accepted principles.  *See Smartflash LLC v. Apple,*

25   *Inc.*, No. 13-cv-00447, 2014 WL 7336213, at *4 (E.D. Tex. Dec. 23, 2014) (rejecting argument

26   that survey evidence should be excluded because the expert "surveyed only 'regular users' instead

27   of all 'purchasers' of accused devices;" finding that this argument "go[es] to the weight of the

28   survey evidence, not its admissibility").

United States District Court
Northern District of California

9

1    I am also unconvinced by Motorola's concern that the features evaluated in the Imaging

2  Feature Study "do not correlate to any specific [patent in suit]." Mot. 10.  The study asked

3  consumers about "Digital Zoom," "Red Eye Detection," "Face Detection," and "Color/Effects

4  Filter."  Pardy Rpt. ¶ 50.  Pardy correlates "Digital Zoom" with the '427 patent, "Red Eye

5  Detection" and "Face Detection" with the '285 and '886 patents, and "Color/Effects Filter" with

6  the '763 patent.  *See id.*  Pardy explains in his report that he makes this correlation based on

7  conversations he had with Fujifilm's technical experts.  *See id.*  As noted above, testimony

8  regarding the correlation between "Digital Zoom" and the '427 patent is no longer relevant to this

9  case and is properly excluded from trial.  But Motorola's concern over the stated correlation

10  between "Red Eye Detection," "Face Detection," and "Color/Effects Filter," on the one hand, and

11  the asserted claims of the camera patents, on the other, goes to the weight of Pardy's testimony,

12  not its admissibility.  This is particularly so given that Motorola cites no evidence in support of its

13  assertion that the features evaluated in the Imaging Feature Study do not "correlate" to the patents

14  in suit.  *See* Mot. 9-11; Reply 3-4; *Apple*, 2014 WL 794328, at *20 (rejecting Samsung's argument

15  that survey's alleged mischaracterization of patented features rendered survey evidence

16  inadmissible where briefing was "wholly inadequate to draw the line between admissible [and

17  inadmissible] survey evidence . . . Samsung merely string cites a series of expert reports in a

18  footnote with no explanation of the similarities and differences between [the survey's] description

19  of the patents and the asserted claims").  Moreover, Motorola admits that one aspect of the

20  "Color/Effects Filter" feature is the conversion of a digital image to monochrome, the subject

21  matter of the '763 patent.  *See* Mot 10.  Motorola cannot persuasively argue that the Imaging

22  Feature Study "no longer relates to any issue in the case" when Motorola admits that the study

23  asked about a feature that includes the subject matter of one of the patents in suit.  *See Sentius*,

24  2015 WL 331939, at *4 ("Survey questions about the background spell and grammar check

25  features are not unrelated to any issue in the case because, as [defendant] acknowledges, [plaintiff]

26  alleges that specific aspects of the spell and grammar check features infringe its patents.") (internal

27  quotation marks omitted).

28    The motion to exclude Pardy's opinion that Motorola relied on various camera features

United States District Court
Northern District of California

1

2

embodying the asserted claims of the camera patents to increase the sales volume and profits of its smartphones is DENIED.

3

4

        **C.**      **Pardy's opinion that Motorola relied on hotspot and wireless data transfer features embodying the asserted claims of the '119 patent to increase the sales volume and profits of its smartphones**

5

6

7

8

9

10

11

      Motorola takes issue with Pardy's opinion that "[b]ecause [the hotspot and wireless data transfer features] allowed consumers to easily 'free' photos and other data stored on their devices without having to connect to the internet or cellular network in order to print photos at a local printer, store kiosk, etc. or to complete the transfer of data, in my opinion [these features] offered substantial benefits and value to consumers." Mot. 11 (quoting Pardy Rpt. ¶ 64). Motorola argues that this opinion is inadmissible because it is "not based on data or facts" and because hotspot and wireless data transfer capabilities "were never featured in Motorola's marketing." Mot. 11-12.

12

13

14

15

16

17

18

19

      These arguments are not supported by the record. Pardy's opinion is based on "data or facts." The relevant portion of Pardy's report cites to a number of sources, including a Motorola "Product Potential Assessment Report" finding that the hotspot feature generated a "Very High Motivation" for the target product, a Motorola "consumer feedback study" finding that wireless data transfer functionality "serves to heighten . . . appeal," and a survey finding that 62 percent of smartphone users "leveraged their devices' hotspot capabilities." Pardy Rpt. ¶¶ 56-57, 63. Motorola contends these studies are not relevant or reliable but provides no explanation as to why they are either irrelevant or unreliable. *See* Reply 5.

20

21

22

23

24

25

26

      Motorola's assertion that the hotspot and wireless data transfer capabilities were never featured in Motorola's marketing is also incorrect. Motorola's own marketing expert states in his report that hotspot functionality was featured in the original advertising campaign for the Droid X telephone. J. Le Cannellier Rebuttal Rpt. 34 (Carr. Decl. Ex. 5, Dkt. No. 237-9). In any event, Motorola cites no authority for its apparent position that product features must have been specifically and explicitly featured in advertising to be found to have driven consumer demand. *See* Mot. 11-12.

27

28

      The motion to exclude Pardy's opinion that Motorola relied on hotspot and wireless data

United States District Court
Northern District of California

transfer features embodying the asserted claims of the '119 patent to increase the sales volume and profits of its smartphones is DENIED.

> **D.    Pardy's opinion that smartphone features embodying the patents in suit "contributed in a meaningful way to make smartphone cameras 'good enough' to replace digital still cameras for many consumers," and "helped allow Motorola to successfully compete in the U.S. smartphone market"**

Motorola contends this opinion is inadmissible because Pardy offers "no basis" for it.  Mot. 12-13.  Motorola is wrong.  The opinion is supported by much of the testimony and other evidence discussed above.  It is also supported by Pardy's observation that Motorola launched the Droid X (which is accused of infringing each of the patents in suit) and subsequently became the fastest growing smartphone manufacturer in the United States within a year of a 2009 Motorola study that criticized the Droid's camera as being "disappointing" and having "fuzzy images."  Pardy Rpt. ¶ 70.

Motorola further contends that the opinion is inadmissible because Pardy fails to explicitly address a number of factual circumstances that might weaken the causal connection between Motorola's alleged infringement of the patents in suit and its increase in sales volume.  For example, Pardy does not appear to consider "whether Motorola was using the same technology before 2010," or "whether Motorola did anything else different between 2009 and 2010 that might explain its increase in sales volume."  Mot. 12; Reply 6.  While Pardy's opinion would be strengthened if it addressed these and other potential counters to his analysis, his failure to explicitly address them does not render his opinion inadmissible.  Indeed, Motorola offers no evidentiary support for any of the factual circumstances it faults Pardy for failing to consider.  *See* Mot. 12; Reply 6.  Questions regarding which facts are most relevant or reliable for calculating a reasonable royalty go the weight of expert opinion, not its admissibility, and are properly left to the jury.  *Apple Inc. v. Motorola, Inc.*, 757 F.3d 1286, 1315 (Fed. Cir. 2014).  Motorola will have an opportunity to present evidence refuting Pardy's opinion at trial.

The motion to exclude Pardy's opinion that smartphone features embodying the patents in suit "contributed in a meaningful way to make smartphone cameras 'good enough' to replace digital still cameras for many consumers," and "helped allow Motorola to successfully compete in

1    the U.S. smartphone market" is DENIED.

2    **II.    MOTION TO EXCLUDE TESTIMONY OF DR. GARETH MACARTNEY**

3          Dr. Gareth Macartney holds a Ph.D. in Economics and is a Senior Economist and Director

4    of Competition at the consulting firm OnPoint Analytics, Inc.  Macartney Rpt. 2.  Motorola

5    identifies five problems with his testimony: (i) he relies on "irrelevant surveys" and other

6    irrelevant or unreliable data in determining the value of the camera patents; (ii) he improperly

7    bases his $2.95 royalty rate on a variation of the 25 percent rule; (iii) he attempts to bolster his

8    royalty rate though the entire market value rule without the required showing that the patented

9    features drove consumer demand for the accused products; (iv) he calculates a reasonable royalty

10   based on a hypothetical bundled license specifying the same per-unit royalty payment for each

11   accused product, even though most of the accused products are accused of infringing only a subset

12   of the patents in suit; and (v) he applies the wrong damages period.  Mot. 13.  I address each

13   alleged problem in turn.

14         **A.     Surveys and other data used to determine the value of the camera patents**

15         Motorola faults Dr. Macartney for relying on two irrelevant and/or unreliable Motorola

16   consumer studies in ascertaining the approximate value of the asserted claims.  The studies are the

17   Imaging Feature Study described above, and a "Product Potential Assessment" dated September

18   2011 (the "September 2011 Study").  Motorola also contends that Dr. Macartney's opinions

19   regarding the value of the '119 patent are based on irrelevant and/or unreliable data.

20              **1.    Imaging Feature Study**

21         Motorola's arguments regarding Dr. Macartney's use of the Imaging Feature Study largely

22   overlap with its arguments regarding Pardy's use of the study.  Motorola contends the Imaging

23   Feature Study is irrelevant because "it was not designed to study functionality enabled by the

24   [camera patents]" and did not "list any feature that was only possible through use of the [camera

25   patents]."  Mot. 16.  Motorola also recycles its contention that the study's exclusive questioning of

26   "mid/high tier smartphone owners" renders it inadmissible.  Mot. 17.

27         These arguments are without merit.  Wherever the line is "between when a survey

28   question's description of patented technology is 'close enough' to the asserted claim as to be an

United States District Court
Northern District of California

13

issue of weight and when a survey question so departs from the asserted claim as to be excluded under Rules 702 and 403," *Apple*, 2014 WL 794328, at *18, the Imaging Feature Study does not cross it. That the study was not specifically designed for the purpose of evaluating the patents in suit does not render it inadmissible. The test for admissibility of survey evidence is whether the survey is "relevant and conducted according to accepted principles." *Clicks*, 251 F.3d at 1263. Motorola cites no authority indicating that a survey must be designed with the asserted claims in mind to qualify as either relevant or consistent with accepted principles.

Motorola also fails to cite evidence in support of its assertion that the Imaging Feature Study did not list any feature that "was only possible" through use of the camera patents. Even if Motorola had established this purported mismatch between survey and claims, there is no requirement that a survey's description of the patented technology correspond precisely to the underlying invention. *See Sentius*, 2015 WL 331939, at *4 (while the patentee's expert "could have more narrowly tailored his survey questions to isolate the accused aspects of [defendant's product], . . . this defect is not sufficient to establish that the survey's description of the claimed invention varied so much from what is claimed that the survey no longer relates to any issue in the case") (internal quotation marks and modifications omitted); *see also Apple*, 757 F.3d at 1318 (approving expert's use of an "existing product containing features he contended were similar to the asserted features" to determine reasonably royalty; stating that the opposing party "may address any technical differences between [the existing product] and the asserted features . . . during cross-examination").

Motorola's argument that the Imaging Feature Study is inadmissible because only "mid/high tier smartphone owners" were surveyed fails for the reasons stated above with respect to Pardy's testimony.

Motorola additionally contends that Dr. Macartney's use of the Imaging Feature Study must be excluded because the study employs a statistical methodology called "Maximum Difference Scaling," or "MaxDiff." Mot. 18. Motorola states that in MaxDiff studies, survey respondents are shown a set of items and asked to select from the set a pair comprising the best and worst items (or the most and least important items, or the most and least appealing items, etc.).

14

1    Mot. 5 n.4.  MaxDiff operates under the assumption that survey respondents "evaluate all possible

2    pairs of items within the . . . set and choose the pair that reflects the maximum difference in

3    preference or importance."  *Id.*  Motorola contends that the Imaging Feature Study's use of

4    MaxDiff renders it inadmissible because Dr. Macartney stated at his deposition that he could not

5    recall any article in which a MaxDiff survey has been used in determining a reasonable royalty

6    where the survey includes multiple product features, only some of which correlate to the patents in

7    suit.  Mot. 18 (citing Macartney Dep. 195-96).  According to Motorola, while MaxDiff and

8    "conjoint analysis"[1] may be applied together to value patented features, the Imaging Feature

9    Study's "naked" MaxDiff analysis is "valueless" for this purpose.  Reply 8-9.

10          In defense of the Imaging Feature Study's use of MaxDiff, Fujifilm submits a declaration

11   by Dr. Macartney explaining that "MaxDiff survey results are often used and relied upon by

12   experts to determine the relative importance and values of product features.  In fact, it is

13   considered by some authors to be the 'most accurate and valid research method available' for that

14   purpose."[2]  Macartney Decl. ¶ 10 (Dkt. No. 238-1) (quoting Michael S. Garver, "A Maximum

15   Difference Scaling Application for Customer Satisfaction Researchers," *International Journal of*

16   *Market Research*, Vol. 51, No. 4 (2009) at 482).  Three publications attached to the declaration

17   further describe how MaxDiff surveys work and the advantages of this approach to assessing

18   consumer preferences.  *See id.* at ¶¶ 10-13, Exs. 1-3.

19          The Imaging Feature Study's use of MaxDiff does not render it, or Dr. Macartney's

20   testimony regarding it, inadmissible.  The record indicates, and Motorola does not dispute, that

21   MaxDiff is a commonly used and well regarded statistical methodology that was properly applied

22   (by Motorola) when the Imaging Feature Study was conducted.  Motorola repeatedly emphasizes

23   that Dr. Macartney was unable to identify an article in which a MaxDiff survey has been used in

24   determining a reasonable royalty where the MaxDiff survey includes multiple product features,

25   only some of which correlate to the patents in suit.  But just because Dr. Macartney's particular use

26

27   [1] Motorola describes "conjoint analysis" as "a statistical analysis tool used to determine how
     people value features or a product or service."  Reply 8.

28   [2] Motorola's request to strike this declaration and the documents attached to it is DENIED.

United States District Court
Northern District of California

1   of a MaxDiff survey has not been featured in a published article does not mean it is unreliable.

2   Motorola offers no explanation as to why MaxDiff may only be used to value patented features if it

3   is applied together with conjoint analysis, or why a "naked" MaxDiff analysis is "valueless" in

4   determining a reasonably royalty.  Absent an explanation of why Dr. Macartney's reliance on a

5   MaxDiff survey in this context is unreliable, I do not find it appropriate to preclude this testimony

6   at this time.  *See Apple*, 2014 WL 794328, at *15-17 (denying motion to exclude expert's use of

7   "conjoint surveys" to quantify demand for allegedly infringing features, even though conjoint

8   surveys in prior cases had not been used for that purpose, where movant "provide[d] no basis for

9   why this distinction is material").

10          At oral argument, Motorola took a slightly different approach to attacking Dr. Macartney's

11  reliance on the Imaging Feature Study, asserting that it amounts to the sort of "black box" damages

12  analysis that judges in this district have found inadmissible under Rule 702.  *See, e.g., Open Text*

13  *S.A. v. Box, Inc.*, No. 13-cv-04910-JD, 2015 WL 349197, at *6 (N.D. Cal. Jan. 23, 2015)

14  (excluding royalty rate testimony where expert failed to "spel[l] out the steps she took to go from

15  the data to the royalty rate opinion," such that "the jury cannot see how the pieces fit together or

16  how the data drives the conclusion"); *GPNE Corp. v. Apple, Inc.*, No. 12-cv-02885-LHK, 2014

17  WL 1494247, at *4 (N.D. Cal. Apr. 16, 2014) (excluding royalty rate testimony where expert

18  "advance[d] no reasoned basis for deriving his $1 per unit royalty from the $86 average net

19  incremental profit" and instead stated that his opinion was based on "all of the evidence in the

20  record" and his "30 years of experience").  However, as exemplified by Motorola's detailed

21  recitation of the precise steps that Dr. Macartney took in using the Imaging Feature Study to

22  inform his conclusions, *see* Mot. 14, this is not a case where the expert failed to follow any

23  "discernible methodology," or is essentially "a black box into which data is fed at one end and

24  from which an answer emerges at the other."  *GPNE*, 2014 WL 1494247, at *4.  Dr. Macartney

25  specifically describes in his report how he used the Imaging Feature Study to determine the value

26  of the camera patents, and how that determination fits into his overall reasonably royalty opinion.

27  *See* Macartney Rpt. 69-74.  Motorola will have an opportunity to expose any flaws in Dr.

28  Macartney's use of the Imaging Feature Study during cross examination.  In contrast with the

United States District Court
Northern District of California

16

expert testimony at issue in *Open Text* and *GPNE*, Dr. Macartney's methodology is sufficiently transparent for cross examination to highlight its deficiencies, if any. *See GPNE*, 2014 WL 1494247, at *6 (noting that cross examination would be "futile" where expert's assertions "fundamentally reduce to taking his opinion based on 30 years of experience for granted"). The motion to exclude Dr. Macartney's testimony regarding the Imaging Feature Study is DENIED.

## 2.    September 2011 Survey

Macartney relies on the September 2011 Study as the basis for his conclusion that consumers value a "high quality camera" at $50. Macartney Rpt. 68-69. He explains in his report that the September 2011 Study

> determined that 84 percent of consumers preferred a 13 megapixel camera over an 8 megapixel camera, "even given a . . . higher price." Because consumers equate megapixel size with camera quality, this demonstrates that consumers highly value high quality cameras in their smartphone[s].
>
> The [September 2011 Study] further found that the preference for a 13 megapixel camera over an 8 megapixel camera "remains strong even if consumers have to pay $50 more," with an astonishing 77 percent of consumers choosing to pay $50 more for the 13 megapixel size. This $50 can be used as a proxy for the value of a high quality camera.

Macartney Rpt. 68-69 (internal footnotes omitted).

Motorola argues the September 2011 Survey is irrelevant and unreliable because (i) its 122 person sample size "is not big enough to be statistically significant;" (ii) all survey respondents were "high income;" (iii) the accused product that survey respondents were asked about is not accused of infringing all the camera patents; and (iv) survey respondents were asked about the additional value they placed on a camera with a high megapixel count, but none of the camera patents have to do with high megapixel count, and "there is no basis for Dr. Macartney's opinion that megapixel counts are an accurate proxy for a 'high quality camera.'" Mot. 16.

Each of these challenges goes to weight, not admissibility. *See Clicks*, 251 F.3d at 1263 ("follow-on issues of methodology, survey design, . . . the experience and reputation of the expert, critique of conclusions, and the like go to the weight of the survey rather than its admissibility). Motorola does not explain why the sample size of 122 respondents, in a study that Motorola

United States District Court
Northern District of California

1    conducted itself, is "not big enough to be statistically significant" or is in any other way contrary

2    to accepted principles.  Nor does Motorola explain why the survey respondents being "high

3    income" renders the study inadmissible.  Moreover, the respondents to the September 2011 Study

4    were not "high income" – rather, they were "high tier," meaning that they "expect[ed] to pay"

5    $199 or more for their next smartphone.  Carr Decl. Ex. 6 at 3 (Dkt. No. 237-10).

6           Motorola also fails to articulate why the September 2011 Study's focus on a single accused

7    product makes the study irrelevant or unreliable, given that Dr. Macartney uses the study

8    exclusively for the purpose of assigning a particular monetary value to consumers' desire for a

9    "high quality camera."  If Motorola believes the study's focus on a single accused product

10   adversely impacts the significance of its results as used by Dr. Macartney, Motorola may raise this

11   alleged deficiency on cross examination.

12          Finally, Dr. Macartney's opinion that consumers equate megapixel count with camera

13   quality is sufficiently supported by the record to merit admission.  Dr. Macartney explained at his

14   deposition that he reads megapixel count (as used in the September 2011 Study) as a proxy for

15   camera quality because when entities "like Motorola . . . make presentations to consumers, they

16   present megapixels as being a proxy for a high quality camera "  Macartney Dep. 149 (Carr Decl.

17   Ex. 7, Dkt. No. 237-11).  Also at his deposition, Dr. Macartney referenced multiple Motorola

18   documents indicating that consumers perceive megapixel count as an indicator of overall camera

19   quality.  *See, e.g.,* Carr Decl. Ex. 10 at 3 ("Consumers have historically based camera image

20   quality perceptions on megapixels.").

21                    **3.    Data regarding the value of the '119 patent**

22          Dr. Macartney calculates the value of the '119 patent by the following analysis: He first

23   explains that while service plans for AT&T and Verizon require consumers to pay an additional

24   $20 per month for a standalone hotspot device, consumers do not have to pay an additional fee to

25   use the hotspot feature on their smartphones.  Macartney Rpt. 75.  Consumers employing the

26   hotspot feature on their smartphones thus save the $20 per month they would otherwise need to

27   spend for a standalone hotspot device.  *Id.*  "This $20 per month charge is essentially built into the

28   price of the smartphone over the duration of its use."  *Id.*

United States District Court
Northern District of California

The $20 per month charge is not all profit for smartphone manufacturers, however. Macartney Rpt. 76. Macartney opines that the profit margin on the $20 per month charge is fifty percent, and that smartphone manufacturers and service providers generally share profits. *Id.* Macartney then determines that at least 25 percent of the profit earned on the hotspot feature would be taken by Motorola, while at least 75 percent would be taken by the service provider. *Id.* He bases this 25/75 split on his "computation that, in general, at least 25 percent of revenue received from cellphone customers of the major [service providers] is passed on to cellphone manufacturers." *Id.* This computation is based, in turn, on his analysis of 10-Ks from AT&T, Sprint, T-Mobile, and Verizon. *Id.* at 76-77.

Using this analysis, Macartney determines that Motorola earns profits of $2.50 per month per smartphone attributable to the hotspot feature. Macartney Rpt. 78. Macartney notes that the average lifespan of a smartphone is eighteen months but makes a "conservative downward adjustment" to one year, yielding profits of $30 per smartphone attributable to the hotspot feature. *Id.* He then acknowledges that the value of the hotspot feature should be "adjusted according to actual use." *Id.* at 79. Based on a December 2012 survey conducted by United Sample, Inc. and commissioned by Smith Micro Software, Inc., Macartney determines that approximately 31.8 percent of smartphone owners frequently use their smartphone's hotspot feature. *Id.* Macartney then takes 31.8 percent of $30 to reach his opinion on the per-smartphone value of the '119 patent, $9.54. *Id.*

Motorola argues this testimony is inadmissible because (i) Macartney's assumption that the $20 per month charge is "essentially built into the price" of smartphones is unfounded because federal law prohibits service providers from charging consumers for the use of smartphone hotspot features; (ii) Macartney's opinion that the profit margin on the $20 per month charge is 50 percent is based on "an internal Motorola document" that "speculates" that profit margins "might" be 50 percent, not on direct evidence from any service provider; (iii) Macartney's determination of the 25/75 percent split is not adequately supported by the 10-Ks he reviewed; and (iv) the December 2012 survey Macartney cites to support his determination that approximately 31.8 percent of smartphone users frequently use hotspot functionality is unreliable. Mot. 19-20.

1    None of these arguments warrants excluding Dr. Macartney's testimony.  Motorola's

2    disagreements with Dr. Macartney's interpretation of the evidence  raise questions regarding

3    which facts are most relevant or reliable for calculating the reasonable royalty in this case.  *See*

4    *Apple*, 757 F.3d at 1315.  Such questions go to the weight of expert opinion, not its admissibility.

5    *Id.*  The motion to exclude Dr. Macartney's testimony on the value of the '119 patent is DENIED.

6    **B.    25 percent rule**

7    The 25 percent rule was a tool used to approximate the reasonable royalty an accused

8    infringer would be willing to pay the patentee during a hypothetical negotiation.  *See Uniloc USA,*

9    *Inc. v. Microsoft Corp.*, 632 F.3d 1292, 1312 (Fed. Cir. 2011).  Under the rule, the reasonable

10   royalty analysis would begin at a 25 percent baseline and then adjust up or down according to the

11   *Georgia-Pacific* factors.  *See id.* at 1314-15.  In *Uniloc*, the Federal Circuit rejected use of the rule,

12   holding that it is a "fundamentally flawed tool for determining a baseline royalty rate in a

13   hypothetical negotiation" and is thus inadmissible at trial.  *Id.* at 1315.  After *Uniloc*, expert

14   testimony aimed at establishing a reasonable royalty rate cannot start from an arbitrary baseline; it

15   must be based on "the relevant facts and circumstances of the particular case at issue and the

16   hypothetical negotiations that would have taken place in light of those facts and circumstances."

17   *Id.* at 1318.

18   Motorola contends that Dr. Macartney's  opinion that the parties would have agreed on a

19   10 percent royalty rate is inadmissible under *Uniloc* because it is simply a "variation of the 25

20   percent rule."  Mot. 20.  What Motorola appears to mean is that Dr. Macartney does not

21   adequately explain how he arrived at the 10 percent figure.  Motorola asserts that Dr. Macartney

22   purports to base the figure on Motorola's research and development expenses, but his report

23   "contains no analysis of how Motorola's total research and development expenditures . . . relate in

24   any way to how Motorola would be willing to pay . . . for the patents in suit."  Mot. 21.  Motorola

25   contends that Dr. Macartney provides no other basis for a 10 percent royalty rate and that the

26   opinion is thus inadmissible.  *See Whitserve*, 694 F.3d at 31 ("[W]hile mathematical precision is

27   not required, some explanation of both why and generally to what extent the particular [*Georgia*

28   *Pacific*] factor impacts the royalty calculation is needed.");  *Open Text*, 2015 WL 349197, at *6;

United States District Court
Northern District of California

1    *GPNE*, 2014 WL 1494247, at *4.

2            Fujifilm responds that the 10 percent royalty rate is adequately explained in Dr.

3    Macartney's report.  In the pages cited by Fujifilm, Dr. Macartney states in relevant part:

4            Based on my analysis in the preceding sections (summarized in
             Table 10 above) which demonstrates the strength of Fujifilm's
5            bargaining position relative to Motorola in the hypothetical
             negotiation . . . , I propose a highly conservative royalty rate of
6            $2.95 per unit (i.e., 10 percent of $29.54).

7            In order to see that it is highly conservative that Motorola would
             have passed 10 percent of the incremental profits from the patented
8            inventions to Fujifilm in the form of royalties, it is instructive to
             investigate Motorola's customary expenditures on innovation in the
9            form of research and development (R&D) expenditure and royalties
             as a percentage of profits.  In general, Motorola's R&D expenses
10           (including royalty payments) represent far more than 10 percent of
             their gross profits . . . Even if we compare the R&D expenses to net
11           sales instead of gross profits, the R&D expenses are still greater than
             10 percent of the company's net sales in every year from 2007
12           through 2013.

13           [ . . . ]

14           Given these results, it is reasonable to conclude that Motorola would
             have passed at least 10 percent of the incremental profits from the
15           patents in suit to Fujifilm in the form of royalties.  If Motorola had
             licensed the patents in suit from Fujifilm, its royalty payments to
16           Fujifilm would have constituted its primary R&D costs for
             incorporating the patents-in-suit into the accused products.  As
17           shown above, Motorola customarily incurs R&D and royalty
             expenses much greater than 10% of its gross profits. Thus, in the
18           hypothetical negotiation, Motorola would have agreed to pay a
             royalty to Fujifilm at least equal to 10% of its expected incremental
19           profits from using the licensed technology.

20           Macartney Rpt. 144-46.

21           "Table 10," referenced in the first paragraph of the above excerpt, summarizes Dr.

22   Macartney's analysis of thirteen of the fifteen *Georgia-Pacific* factors and explains their effect, in

23   general terms, on the parties' respective bargaining positions.  *See* Macartney Rpt. 41.  For

24   example, with respect to *Georgia-Pacific* factors 9 and 10,  Dr. Macartney explains that

25   "alternatives exist, but they are all inferior to the infringing technology and commercially

26   unacceptable."  *Id.*  He states that this would result in the "[s]trengthening of Fujifilm's bargaining

27   position at the expense of Motorola."  *Id.*

28           While Dr. Macartney's determination of a 10 percent royalty rate could be better

United States District Court
Northern District of California

United States District Court
Northern District of California

supported, he provides sufficient explanation of his analysis to distinguish this case from those like *Open Text* and *GPNE*, where the expert fails to follow any "discernable methodology" and is essentially "a black box into which data is fed at one end and from which an answer emerges at the other." *GPNE*, 2014 WL 1494247, at *4. Dr. Macartney does not state that the 10 percent royalty rate is based on "all of the evidence in the record," his "years of experience," or other similarly vague and unverifiable sources. *See id.* Rather, Dr. Macartney links his royalty rate opinion both to Motorola's research and development expenses and to the *Georgia-Pacific* factors. Viewed in a vacuum, Dr. Macartney's *Georgia-Pacific* analysis might be too generalized to support his royalty rate opinion. But that analysis combined with Dr. Macartney's review of Motorola's research and development expenses makes the 10 percent figure sufficiently linked to "the relevant facts and circumstances of [this case]" to be presented to the jury. *Uniloc*, 632 F.3d at 1318. Motorola's motion to exclude this testimony is DENIED.

### C.    Entire market value rule

Motorola next accuses Dr. Macartney of improperly attempting "to bolster his analysis by comparing the royalties he calculates to all of Motorola's revenues from sales of the accused products." Mot. 21. Dr. Macartney opines in his report that

> "[c]ombined sales of the accused products generated large profits for Motorola – profits that would in large part have been unavailable in the absence of patent infringement . . . Motorola's profits on the infringing sales have been more than $3.1 billion. The $63,725,372 of royalties proposed in this report represents 2.7 percent of the profits earned on the accused products."

Macartney Rpt. 149. Dr. Macartney also states that the royalties he proposes "comprise only 0.71 percent of the net sales of the accused products since April 2011." *Id.* at 151. At his deposition, Dr. Macartney explained that these statements were intended as "a sort of reasonableness check" on his actual reasonable royalty analysis. Macartney Dep. 271. Motorola argues that the statements violate the entire market value rule. Mot. 21.

Motorola is right. "The entire market value rule allows a patentee to assess damages based on the entire market value of the accused product only where the patented feature creates the basis for customer demand or substantially creates the value of the component parts." *Uniloc*, 632 F.3d

at 1318 (internal quotation marks and modifications omitted).  "[I]t is not enough to merely show that the patented feature is viewed as valuable, important, or even essential to the use of the overall product."  *Virnetx, Inc. v. Cisco Sys., Inc.*, 767 F.3d 1308, 1326-27 (Fed. Cir. 2014). "These strict requirements limiting the entire market value exception ensure that a reasonable royalty does not overreach and encompass components not covered by the patent."  *Id.* at 1326.

Fujifilm has not established that the entire market value exception applies here.  Fujifilm does not identify any evidence in Dr. Macartney's report indicating that any of the patented features either "creat[e] the basis for customer demand" for the accused products or "substantially creat[e] the value of the component parts."  *Uniloc*, 632 F.3d at 1318.  Indeed, Dr. Macartney testified at his deposition that he did not apply the entire market value approach in reaching his reasonably royalty opinion.  Macartney Dep. 266.  Fujifilm makes a half-hearted attempt in its opposition brief to identify evidence to support an entire market value theory, but the evidence it cites falls far short of satisfying the "strict requirements" limiting application of the exception. *See* Opp. 23.

Fujifilm also contends that Dr. Macartney's reliance on the total sales of the accused products should be excused because he references the total sales only as "a sort of reasonableness check" of his actual reasonably royalty analysis.  Opp. 22.   But this is precisely what the patentee's expert did in *Uniloc*.  The expert there "performed a check to determine whether his $564,946,803 royalty figure was reasonable by comparing it to his calculation of Microsoft's approximate total revenue for Office and Windows."  632 F.3d at 1318 (internal quotation marks omitted).  On appeal, the patentee argued the total revenue figure "was used only as a 'check' and the jury was instructed not to base its damages determination on the entire market value, an instruction it should be presumed to have followed."  *Id.* at 1319.  The Federal Circuit disagreed, reasoning that "[e]ven if the jury's damages calculation was not based wholly on the entire market value check, the award was supported in part by the faulty foundation of the entire market value."  *Id.* at 1321.

Dr. Macartney's testimony regarding the total revenue from sales of the accused products "cannot help but skew the damages horizon for the jury."  *Uniloc*, 632 F.3d at 1320.  Motorola's

motion to exclude this testimony is GRANTED.

**D.    Bundled license**

Dr. Macartney asserts that the parties would have agreed to a "bundled license for all [patents in suit] that would have specified a single fixed payment for each infringing unit sold, regardless of the number of patents it infringes." Macartney Rpt. 152. Motorola does not challenge the factual basis for this opinion – that is, Motorola does not argue that Dr. Macartney's opinion that the parties would have agreed to a bundled license specifying "a single fixed payment for each infringing unit sold" lacks evidentiary support. *See* Mot. 23-24; Reply 14-15. Rather, Motorola argues the opinion is improper because it effectively assigns to each accused product liability for infringement of all patents in suit, even though the majority of the accused products are accused of infringing only a subset of the patents in suit. Mot. 23-24.

The motion to exclude this opinion is DENIED. Motorola's position is based principally on the text of 35 U.S.C. § 284, which provides that a patentee who prevails in an infringement action is entitled to damages "adequate to compensate for the infringement, but in no event less than a reasonable royalty for the use made of the invention by the infringer." 35 U.S.C. § 284. According to Motorola, by assigning to each accused product the same per-unit royalty payment – irrespective of how many of the patents in suit that product is actually accused of infringing – Dr. Macartney's bundled license opinion awards to Fujifilm a reasonable royalty in excess of that adequate to compensate "for the use made of the invention." *See* Mot. 23-24. In *Oracle Am., Inc. v. Google Inc.*, 798 F. Supp. 2d 1111 (N.D. Cal. 2011), Judge Alsup applied similar reasoning in precluding a patentee's damages expert from opining that the parties would have agreed to a license for "all" of the Java software platform, where the asserted claims were directed at only certain improvements to Java. *Id.* at 1115. He stated: "Java was not the invention. Only the claims asserted were the invention. Therefore, the hypothetical license must be limited to the asserted claims." *Id.* (emphasis omitted).

I am not persuaded that section 284 requires the exclusion of Dr. Macartney's bundled license testimony. Dr. Macartney provides substantial evidence in support of his opinion that the parties would have agreed to a bundled license specifying the same per-unit royalty payment for

United States District Court
Northern District of California

1    each accused product, including a review of more than twenty-five bundled license agreements

2    previously entered into by either Fujifilm or Motorola.  *See* Macartney Rpt. 136-39.  As stated

3    above, Motorola does not challenge the sufficiency or reliability of this evidence.  *See* Mot. 23-24;

4    Reply 14-15.  The goal of the hypothetical negotiation analysis is to determine "the royalty upon

5    which the parties would have agreed had they successfully negotiated an agreement just before

6    infringement began."  *Lucent,* 580 F.3d at 1324.  Dr. Macartney's testimony provides an adequate

7    basis for a jury to find that, in this case, the royalty the parties would have agreed upon would

8    have involved a bundled license specifying the same per-unit payment for each accused product.

9    Contrary to Motorola's position, such a finding would not conflict with section 284's directive to

10   base the reasonably royalty award on the "the use made of the invention by the infringer."  Rather,

11   it would indicate that, in this case, in exchange for the right to "make use" of each of the

12   inventions claimed by the patents in suit, Motorola would have been willing to pay the same per-

13   unit royalty for each accused product.

14       The motion to exclude Dr. Macartney's bundled license opinion is DENIED.

15       **E.       Damages period**

16       Motorola's final argument raises another issue arising from Dr. Macartney's opinion that

17   the parties would have agreed to a bundled license.  Under 35 U.S.C. § 287, where, as here, the

18   patentee has failed to "mark" the claimed invention, "no damages shall be recovered by the

19   patentee in any action for infringement, except on proof that the infringer was notified of the

20   infringement and continued to infringe thereafter, in which event damages may be recovered only

21   for infringement occurring after such notice."  *Id.*  Fujifilm does not dispute that Motorola did not

22   receive notice of the '285 patent until November 8, 2012, two days after the '285 patent was

23   issued on November 6, 2012.  *See* Opp. 24-25.  Nevertheless, Dr. Macartney calculates damages

24   for the '285 patent, along with the three other patents in suit, beginning in April 2011.  Macartney

25   Rpt. 151.  Motorola argues this opinion is so "fundamentally flawed" as to justify excluding all of

26   Dr. Macartney's testimony from trial.  Mot. 25.

27       Fujifilm responds that calculating damages for the '285 patent beginning in April 2011 is

28   proper because, according to Dr. Macartney's analysis, the '285 patent would have been part of

United States District Court
Northern District of California

1  the same bundled license agreement as the other patents in suit.  Opp. 24.  Fujifilm also notes that

2  the '285 patent is part of the same patent family as the '886 patent, and that the asserted claims

3  from the two patents are "substantially identical."  Opp. 25.

4  Fujifilm's position on this issue is far from convincing.  The law is clear that, absent

5  marking, damages may not be recovered for infringement occurring before the infringer was

6  notified of the infringement.  35 U.S.C. § 287; *Minks v. Polaris Indus., Inc.*, 546 F.3d 1364, 1376

7  (Fed. Cir. 2008) ("Section 287(a) requires actual notice to the accused to assure that the recipient

8  knew of the adverse patent during the period in which liability accrues, when constructive notice

9  by marking is absent.") (internal quotation marks omitted).  Fujifilm nevertheless contends that

10  because Dr. Macartney believes the parties would have entered a single bundled license for all

11  patents in suit, Fujifilm may recover damages for infringement of the '285 patent that occurred

12  more than a year before Motorola received the requisite notice (and more than a year before the

13  '285 patent had even been issued).  Fujifilm's position is essentially that where section 287

14  conflicts with a patentee's hypothetical negotiation analysis, the hypothetical negotiation analysis

15  controls.  Fujifilm cites no authority for this position, and I am not aware of any.  That the '285

16  and '886 patent are from the same patent family and contain substantially identical asserted claims

17  is also an insufficient basis for allowing Fujifilm to recover damages in contravention of section

18  287.

19  The motion to exclude this particular opinion is GRANTED.  However, because I do not

20  find that the defects in this particular opinion render the rest of Dr. Macartney's testimony

21  inadmissible, the motion to exclude all of Dr. Macartney's testimony is DENIED.

22  **II.     OUTSTANDING MOTIONS IN LIMINE**

23  On March 19, 2015, I issued an order addressing the bulk of the parties' motions in limine.

24  Dkt. No. 256.  On March 25, 2015, the parties filed a stipulation resolving a number of their other

25  motions in limine.  Dkt. No. 259.  Two motions in limine remain outstanding: Fujifilm's motion

26  no. 4 and Motorola's motion no. 5.

27  Fujifilm's motion no. 4 is GRANTED IN PART and DENIED IN PART.  The motion

28  seeks to preclude Dr. James Lansford from testifying regarding the scope of the Bluetooth Patent

United States District Court
Northern District of California

1   Copyright License Agreement ("BPLA") that provides the basis for Motorola's licensing defense.

2   Dkt. No. 211 at 7.  The motion also seeks to preclude Dr. Lansford from testifying regarding the

3   general nature of standard setting organizations.  *Id.*

4          Dr. Lansford may not testify regarding the scope of the BPLA.  It is undisputed that Dr.

5   Lansford is not an expert on contract interpretation.  *See, e.g.,* Lansford Dep. 62 (Dkt. No. 211-7).

6   It is also undisputed that he was not present during the drafting of the BPLA and did not base his

7   opinion regarding its meaning on information obtained from its drafters.  *See, e.g., id.* at 39-40.

8   Rather, his understanding of the BPLA is based on discussions with various attorneys, including

9   Motorola's attorneys in this case.  *See id.* at 67, 71-72.  Because Dr. Lansford's opinion regarding

10  the scope of the BPLA concerns a subject on which he is not an expert and of which he has no

11  personal knowledge, I agree with Fujifilm that it is inadmissible at trial.[3]

12         On the other hand, Dr. Lansford's extensive experience working with standard setting

13  organizations qualifies him to speak to their general purposes and operations.  His testimony on

14  that subject will not be excluded at this time.

15         Motorola's motion no. 5 is GRANTED.  The motion seeks to preclude Dr. Macartney from

16  referencing the alleged cost of Motorola's recent acquisition of Viewdle.  Dkt. No. 9.  Dr.

17  Macartney states in his report that "Motorola's acquisition of Viewdle was rumored to be at a cost

18  of [$30 to $45 million]."  Macartney Rpt. 46 n.148.  In support of this statement, Dr. Macartney

19  points to a quote from the October 4, 2012 article, "Motorola Acquires Viewdle for Face

20  Recognition Technology," published in the *International Business Times*, which reports that while

21  the cost of acquisition "is not available, rumor has it that it is between $30 million and $45

22  million."  *Id.*  Dr. Macartney cites no other sources in support of his opinion on the cost of

23  acquisition.  In light of the absence of verifiable evidence showing how much Motorola actually

24

25  _____

    [3] Even if Dr. Lansford were an expert on contract interpretation, his opinion on the BPLA's
26  meaning would still be inadmissible.  "Absent any need to clarify or define terms of art, science,
    or trade, expert [ ] testimony to interpret contract language is inadmissible."  *TCP Indus., Inc. v.*
27  *Uniroyal, Inc.*, 661 F.2d 542, 549 (6th Cir. 1981); *see also Marx & Co. v. Diners' Club Inc.*, 550
    F.2d 505, 509-10 (2d Cir. 1977) (holding that district court erred in admitting expert statements
28  which "did not concern practices in the securities business, on which [the expert] was qualified [to
    testify], but were rather legal opinions as to the meaning of the contract terms at issue").

United States District Court
Northern District of California

1  paid for Viewdle, I agree with Motorola that Dr. Macartney's opinion on this subject is

2  inadmissible under Rule 403.

3  **IV.    ADMINISTRATIVE MOTIONS TO FILE UNDER SEAL**

4        The parties submitted three administrative motion to file under seal in connection with

5  Motorola's motion to exclude.  Dkt. Nos. 198, 237, 250.  Each of these motions is DENIED

6  WITHOUT PREJUDICE.

7        Because the motion to exclude is aimed at preventing Fujifilm's damages experts from

8  presenting most, if not all, of their opinions at trial, all sealing motions filed in connection with it

9  are subject to the "compelling reasons" standard.  *See Open Text S.A. v. Box, Inc.*, No. 13-cv-

10  04910-JD, 2014 WL 7368594, at *2 (N.D. Cal. Dec. 26, 2014) (applying compelling reasons

11  standard to *Daubert* motions "aimed squarely at the other side's damages methodology").  This

12  standard requires the party seeking sealing to "articulate compelling reasons supported by specific

13  factual findings," identifying the particular interests favoring sealing and showing how those

14  interests outweigh the "strong presumption" favoring disclosure.  *Kamakana v. City & Cnty. of*

15  *Honolulu,* 447 F.3d 1172, 1178-81 (9th Cir. 2006).  Compelling reasons sufficient to justify

16  sealing exist when the materials may "become a vehicle for improper purposes, such as . . . to

17  gratify private spite, promote public scandal, circulate libelous statements, or release trade

18  secrets."  *Id.* at 1179.  "The mere fact that the production of records may lead to a litigant's

19  embarrassment, incrimination, or exposure to further litigation will not, without more, compel the

20  court to seal its records."  *Id.*  "An unsupported assertion of unfair advantage to competitors

21  without explaining how a competitor would use the information to obtain an unfair advantage is

22  insufficient."  *Hodges v. Apple Inc.*, No. 13-cv-01128-WHO, 2013 WL 6070408, at *2 (N.D. Cal.

23  Nov. 18, 2013) (internal quotation marks and modifications omitted).

24        The parties' sealing motions do not satisfy this standard.  They are for the most part

25  grossly overbroad, and the vast majority of their proffered justifications for sealing fall into the

26  category of "unsupported assertion[s] of unfair advantage to competitors without expla[nation]

27  [of] how a competitor would use the information to obtain an unfair advantage."  *Hodges*, 2013

28  WL 6070408, at *2.  Accordingly, the motions are DENIED WITHOUT PREJUDICE.

United States District Court
Northern District of California

If either party still wants any of the materials that are the subject of the three sealing motions to be filed under seal, that party shall file a declaration within seven days of the date of this order identifying the particular documents or portions thereof to be sealed, and articulating "compelling reasons supported by specific factual findings" to justify sealing. *Kamakana,* 447 F.3d at 1178. As the parties consider which of the materials, if any, are in fact sealable, they are advised that none of the information discussed and/or quoted in this order is sufficiently sensitive to warrant sealing under the compelling reasons standard.

## CONCLUSION

For the foregoing reasons:

(i) Motorola's motion to exclude the testimony of Keith Pardy is DENIED. Dkt. No. 202.

(ii) Motorola's motion to exclude the testimony of Dr. Gareth Macartney is GRANTED IN PART and DENIED IN PART. Dkt. No. 202.

(iii) Fujifilm's motion in limine no. 4 is GRANTED IN PART and DENIED IN PART.

(iv) Motorola's motion in limine no. 5 is GRANTED.

(v) All motions to seal filed in connection with Motorola's motion to exclude are DENIED WITHOUT PREJUDICE. Dkt. Nos. 198, 237, 250.

**IT IS SO ORDERED**.

Dated: April 8, 2015



WILLIAM H. ORRICK
United States District Judge